[No. A129408. First Dist., Div. Four. May 26, 2011.]

In re DANIEL C., a Person Coming Under the Juvenile Court Law.
THE PEOPLE, Plaintiff and Respondent, v.
DANIEL C., Defendant and Appellant.

---

1352

---

COUNSEL

James M. Crawford, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Eric D. Share and Christopher W. Grove, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

RUVOLO, P. J.—

## I. INTRODUCTION

Appellant was declared a ward of the juvenile court based on findings that he had committed a robbery in which he used a dangerous and deadly weapon and personally inflicted great bodily injury on the victim. The juvenile court also found true an enhancement allegation that appellant had committed the robbery for the benefit of, at the direction of, and in association with, a criminal street gang.

On appeal, appellant challenges only the true finding on the gang enhancement. We agree this finding is not supported by substantial evidence that appellant committed his crime with the specific intent to promote, further, or assist in criminal conduct by gang members. Accordingly, we reverse the portion of the judgment finding the enhancement true, and remand for a rehearing on disposition.

## II. FACTS AND PROCEDURAL BACKGROUND

Around midnight on June 4, 2010, Jeffrey Chamblee, an assistant manager at a supermarket, saw three young men pictured on the store's surveillance cameras, walking back and forth inside the store. Based on Chamblee's experience as a loss prevention manager, the men's behavior roused his suspicions, so he focused his attention on them.

After a few minutes, two of the young men left the store separately. Appellant remained behind, looking at the bottles displayed in the liquor aisle. When Chamblee saw appellant pick up a large bottle of Jack Daniels and walk away, Chamblee went to a position 10 or 15 feet from the store's exit door. From there, Chamblee kept watching as appellant walked through an unattended check stand and headed for the exit, without stopping or making any effort to pay for the bottle of liquor.

Chamblee approached appellant and asked him to "Give me the bottle." Appellant crouched down and began to run, so Chamblee stepped toward him and reached for the bottle. Appellant then raised the bottle as if to strike Chamblee with it or throw it at him. The bottle broke against a nearby machine. Appellant hit Chamblee on the ear with the neck of the bottle and ran out of the store.[1] Chamblee was later taken to the hospital, where he received 13 stitches to close the six-centimeter head wound appellant had inflicted on him.

---

[1] Appellant's version of the story was that he threw the bottle at Chamblee after it broke.

Another employee of the supermarket, Lucine Avilla, was in the store's parking lot while appellant was in the store. She noticed a young man get into a truck and start the engine. Moments later, she saw appellant hit Chamblee with the broken bottle, leave the store, and run directly toward the truck she had noticed moments earlier.

Police Officer Brian Mann responded to a call from the supermarket. He reviewed the surveillance camera footage of the incident, and asked other officers to look for the truck Avilla had seen, which was described to him as a green pickup truck. Another officer found the truck, stopped it, and detained the four occupants. They were appellant; Kevin Pinochi, who was driving; Justin Holmes; and a young man whose name appears in the record only as "Midgett." All of the truck's occupants were under 21 years old.

Mann interviewed all the occupants of the truck, except for Holmes, who refused to talk with him. Pinochi at first denied going to the supermarket, but later admitted that he and his companions had gone there to get alcohol. When Mann asked how they expected to accomplish that goal, since they were all under age, Pinochi responded, "I don't know. You have to ask them." Midgett admitted to Mann that he had entered the store, but claimed he had only done so in order to use the bathroom. Midgett told Mann that the young men "had all gone in the store for their own reasons." Appellant admitted going to the store to get alcohol, though he had no money with him. He told Mann his friends did not know that he intended to steal a bottle of liquor from the store.

Appellant and his companions were all wearing clothing with an element of red on it. Appellant had a red baseball cap. Pinochi had on an oversized red T-shirt and a red baseball hat. Midgett and Holmes both wore black clothing, but Midgett's jeans had red stitching and his shoes had a red "swoosh" emblem, and Holmes's black jersey had a red number and name printed on the back. In the pickup truck, the police found two crowbars and an 18-inch baseball bat.

On June 7, 2010, a petition was filed in juvenile court under Welfare and Institutions Code section 602, charging appellant with robbery (Pen. Code, § 211),[2] and alleging that in connection with the robbery, appellant personally used a dangerous and deadly weapon, i.e., the broken bottle (§ 12022, subd. (b)(1)), and personally inflicted great bodily injury on his victim (§ 12022.7, subd. (a)). The petition also alleged that the robbery was committed for the benefit of, at the direction of, and in association with a criminal street gang. (§ 186.22, subd. (b)(1)(C).)

---

[2] All further statutory references are to the Penal Code unless otherwise noted.

At appellant's jurisdictional hearing, the prosecution introduced the testimony of Eric Swift, a police detective, who was stipulated to be an expert on gang activity in the relevant area. Swift knew Holmes, understood him to be a "self-admitted" active participant in a Norteño gang,[3] and opined that he was an active gang member. Swift also was familiar with Pinochi, and characterized him as a Norteño affiliate.

Swift opined that appellant was an active Norteño gang participant, and that his crime was committed in association with and for the benefit of the Norteño criminal street gang. Swift acknowledged that he had not met or spoken with appellant previously, despite his familiarity with local gang members.[4] Swift was not aware that any gang enhancements or gang probation conditions were associated with appellant's prior juvenile record. Swift's opinion was based on the "totality" of the circumstances, including the facts of the present case, appellant's associations, and appellant's prior contacts with the police.

Appellant's prior police contacts included three specific incidents, which Swift learned about from formal written police reports and from informal contact with other police officers. First, in January 2008, appellant's mother called the police to report that appellant had burned the symbol "XIV" into his hand, and the police verified that appellant had done so.[5] Appellant denied at the time that the incident had any gang significance or that he had any gang affiliation. However, the XIV symbol is associated with the Norteños, because N is the fourteenth letter of the alphabet.

Second, in January 2009, appellant and some companions robbed two people. Appellant brandished a knife during the robbery. Two days later, appellant and his companions confronted the robbery victims and threatened to kill them if they "snitched" about the robbery. The police were called, and appellant was arrested for robbery and making criminal threats. Swift opined that the crimes for which appellant was arrested on this occasion were "predicate gang crimes" because of the violent nature of the robbery and because of the threat to kill the victims if they reported it. He acknowledged,

---

[3] Appellant's trial counsel stipulated that the Norteños are a criminal street gang as defined in section 186.22.

[4] Swift stated that there were about 1,400 Norteños in Sonoma County, as well as an equal number of Sureños and several hundred members of other gangs. Thus, there were over a thousand active gang members in the county with whom Swift was not personally acquainted.

[5] Swift himself had not seen the burned symbol on appellant's hand. Appellant denied having placed it there, or ever having gotten a gang tattoo, and his mother corroborated that she had never seen any kind of tattoo on appellant's hands. When Swift examined appellant's hand on the record at the trial, at the request of appellant's counsel, he could not detect anything burned into it, or any scars. He averred, however, that the absence of the symbol did not change his opinion regarding appellant's gang involvement.

however, that the crimes statutorily listed as predicate gang crimes can be, and are, committed by nongang members as well as gang members.

Finally, in May 2009, police were dispatched to a local school based on a report that there was a group there talking about stolen cars. Upon their arrival, they found appellant in the company of four or five young men, one of whom Swift characterized as an active Norteño member, Kyle Lopez, who was on probation with gang conditions.[6] The other men in the group did not have any gang affiliation, as far as Swift knew. Swift opined that it was "significant" that appellant had been in the company of an active gang participant. Swift had not heard of Lopez before his name came up in connection with the present case, however, and based his characterization of Lopez as an active gang participant solely on the fact that he had gang conditions on his probation.[7] Appellant was not charged with any crime in relation to this incident, but that did not change Swift's opinion regarding its relevance to appellant's gang associations.

Regarding the present case, Swift based his opinion that the robbery was gang related on the gang affiliations of appellant and two of his companions; the fact that appellant and his companions coordinated their activities in the store and were all wearing clothing with red on it, which is the color associated with the Norteños; and the presence of the crowbars and baseball bat in the truck. Swift explained that the commission of violent crimes benefits a gang because it earns the gang respect, in that members of the community hear about the crime, become afraid of the gang, ·and are thereby encouraged to permit the members to commit other crimes without confronting them or reporting them to the police. Swift believed that people in the community would understand that the crime was committed by Norteños, even though appellant and his companions used no gang-related words or gestures, because the perpetrators all wore clothing with red on it.

Swift testified that the commission of violent crimes also benefits the perpetrator, as a member of the gang, because it raises his level of respect, reputation, and credibility within the gang. On cross-examination, Swift stated that even if appellant had succeeded in shoplifting the bottle of liquor, and the confrontation with Chamblee had not happened, the crime still would have been for the benefit of the gang, as well as appellant's status in it, because it would have shown that appellant and his companions were "putting in work" (i.e., willing to commit crimes) for the gang.

---

[6] Appellant testified that Lopez was a childhood friend who lived on the same street, and with whom he had played basketball over the years.

[7] Swift testified later that a person's having been put on probation with gang conditions would factor into his opinion as to whether or not they were a gang participant, but would not be determinative.

In his defense testimony, appellant explained that he had not met Pinochi before that evening, and did not know Midgett, though he recognized him from school. Appellant knew Holmes, however, because they had been friends at probation camp. On the night of the robbery, appellant was leaving a party on foot, limping and bleeding because he had been beaten up, when Holmes saw him and asked if he wanted a ride. Appellant testified that his understanding was that the group in the truck were going to a supermarket, possibly to meet girls, and that no one mentioned anything about stealing anything there.

Appellant admitted taking the bottle, but said that he only decided to do so on impulse, after he entered the store and used the bathroom. He had been "trying to get drunk the whole night" because earlier that day, he had been fired from his job and then got into an argument with his girlfriend. Appellant denied being, having been, or wanting to be a Norteño, and maintained that he was not trying to make "any sort of gang statement" in connection with the robbery. Appellant explained that he had made friends and played sports with both Norteño and Sureño gang members while at probation camp, but had tried to stay neutral between the two groups. He had not had any gang conditions on his prior probation. He explained that the red baseball cap he was wearing that night was a Philadelphia Phillies team hat, which he had been wearing to work, with his manager's approval, because he worked at a food shop with a Philadelphia theme.

The judge found that the robbery charge and all of the enhancement allegations were true. In support of the gang enhancement, the judge relied not only on the evidence at trial, but also on the court's file regarding appellant's prior juvenile record, of which the parties had stipulated the judge could take judicial notice. The judge concluded (contrary to Swift's opinion) that appellant was not an actual gang member, but that there was "evidence in the probation reports of previous gang involvement," which, though "not substantial," belied appellant's description of himself as a "neutral." In particular, the judge relied on the January 2009 incident, in which appellant was reported to have been part of a group of nine young men who confronted and threatened two people whom they accused of having "snitched." At least some members of that group "identified themselves as being from the West 3 gang," a Norteño gang. In addition, while detained at juvenile hall, appellant reportedly wrote "W 3rd" on a window with soap, and carved "W 3" into the bar of soap. To the judge, this indicated that appellant had a "level of sophistication regarding gang involvement."

In light of appellant's "decision to be associated with a group of young men who were associated with Norteños, one of whom was a[] . . . self-admitted Norteño and the other was an associate himself," and his

"[knowing] full well the gang symbolism of wearing a red hat in this community," the judge did not accept appellant's explanation that he was wearing the hat because it was associated with the job from which he had just been fired. The judge therefore concluded that "the entry into the . . . store to steal liquor was done in concert with the others," and suspected that appellant had been "designated . . . to be the point person" to commit the actual theft, and "knew full well that he was involved in a gang related activity that night when he went in there."

The judge declared appellant a ward of the juvenile court, found him to have committed a felony, and committed him to the Department of Corrections and Rehabilitation, Juvenile Justice, with a maximum term of confinement of 18 years 10 months 11 days, with credit for 48 days in custody. The judge also required appellant to register as a gang member. This timely appeal ensued.

### III. DISCUSSION

Appellant does not challenge the trial court's true findings as to the robbery charge or the deadly weapon and great bodily injury enhancements. His arguments on appeal are directed only to the enhancement imposed under section 186.22, subdivision (b) (the gang enhancement statute). He argues that there was insufficient evidence to support the enhancement; that the admission of hearsay evidence in support of Swift's expert testimony violated his Sixth Amendment right of confrontation; and that his trial counsel's failure to object to the admission of that hearsay evidence constituted ineffective assistance of counsel.

■ Under the terms of the gang enhancement statute, the enhancement applies to "any person who is convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members . . . ." (§ 186.22, subd. (b)(1).)[8] Thus, the trial court can impose the enhancement only if the prosecution establishes both of the following elements beyond a reasonable doubt: first, that the defendant committed a felony (a) for the benefit of, (b) at the direction of, or (c) in association with a criminal street gang; and second, that in connection with the felony, the defendant harbored the *specific intent* to (a) promote, (b) further, or (c) assist in any criminal conduct by gang members.

In the present case, appellant admitted to conduct constituting a felony. In addition, there was substantial evidence to sustain the juvenile court's finding

---

[8] Section 186.22 has recently been amended twice (Stats. 2011, ch. 15, §§ 275, 276; Stats. 2010, ch. 256), but the changes do not affect the quoted language and are irrelevant to the issues in this case.

that his crime was committed "in association with" a criminal street gang within the meaning of section 186.22. Specifically, appellant was accompanied by an admitted Norteño member (Holmes) who appellant knew was associated with the gang, as well as another young man (Pinochi) characterized as a Norteño affiliate by the prosecution's expert. In addition, appellant and all of his companions wore clothing with the Norteño color on it.

Therefore, the remaining question we must address is whether substantial evidence supports the juvenile court's finding that appellant committed his crime *with the specific intent to promote, further, or assist in any criminal conduct by gang members*. This issue involves a review of the record to determine if there is evidentiary support for two necessarily implied findings: (1) appellant had the specific intent when he committed the robbery to "promote, further or assist" (2) gang members who themselves were engaged in criminal conduct. In deciding this issue, we apply the usual standard of review for challenges to the sufficiency of the evidence. "We review claims of insufficient evidence by examining the entire record in the light most favorable to the judgment below. [Citation.] We review to determine if substantial evidence exists for a reasonable trier of fact to find the counts against the minor true beyond a reasonable doubt. [Citation.] Substantial evidence must be reasonable, credible, and of solid value. [Citation.] We also presume the existence of every fact the lower court could reasonably deduce from the evidence in support of its judgment. [Citation.]" (*In re Frank S.* (2006) 141 Cal.App.4th 1192, 1196 [46 Cal.Rptr.3d 839].)

In *People v. Albillar* (2010) 51 Cal.4th 47 [119 Cal.Rptr.3d 415, 244 P.3d 1062] (*Albillar*), our Supreme Court recently interpreted several aspects of the gang enhancement statute. In that case, the defendants were twin brothers and their cousin, all in their 20's, and all members of the same gang. While one of the twins was kissing a 15-year-old girl in the bedroom of the defendants' apartment, the other twin and their cousin came into the room without the girl's consent, and then each of the three raped her in turn. During the first rape, the other men assisted the rapist by helping to hold the girl's legs apart. The girl originally did not report the rape because she knew the defendants were gang members and was afraid they would come after her family. (*Id.* at pp. 52–53.)

The Supreme Court granted review on the question whether the evidence in the case was sufficient to sustain the jury's finding that the defendants violated the gang enhancement statute.[9] (*Albillar, supra,* 51 Cal.4th at pp. 54,

---

[9] The court also considered whether substantial evidence supported the men's convictions of violating section 186.22, subdivision (a), which makes it a crime to actively participate in a criminal street gang with knowledge of its members' pattern of criminal gang activity, and to willfully promote, further, or assist felonious conduct by members of that gang. On this issue,

59). In its opinion, the court rejected the defendants' contentions that the gang enhancement statute requires (1) that the defendant commit the underlying crime for the benefit of, at the direction of, or in association with the gang itself, as opposed to its members; (2) that the criminal conduct by gang members which the defendant specifically intended to promote, further, or assist must be conduct other than the underlying crime to which the enhancement is applied; and (3) that the defendant must specifically intend to promote, further or assist criminal conduct by the gang itself, not just by individual members. (*Id.* at pp. 59–68.)

■ However, while rejecting the defendants' proposed limitations on the applicability of the gang enhancement statute, the court reiterated its previous holding that "the Legislature included the requirement that the crime to be enhanced be committed for the benefit of, at the direction of, or in association with a criminal street gang to make it 'clear that a criminal offense is subject to increased punishment under the [gang enhancement statute and related legislation] only if the crime is "gang related." ' [Citation.] Not every crime committed by gang members is related to a gang." (*Albillar, supra*, 51 Cal.4th at p. 60, citing *People v. Gardeley* (1996) 14 Cal.4th 605, 622 [59 Cal.Rptr.2d 356, 927 P.2d 713].) Similarly, the court noted that the gang enhancement statute "does not risk conviction for mere nominal or passive involvement with a gang. . . . Rather, it applies when a defendant has personally committed a gang-related felony with the specific intent to aid members of that gang." (*Albillar, supra*, 51 Cal.4th at pp. 67–68.)

In concluding that the evidence in *Albillar* warranted imposition of the gang enhancement, the court noted that all three of the men committed the rapes together, and actively assisted one another. As the prosecution's gang expert explained at trial in *Albillar*, committing crimes in concert is characteristic of gang members, because they know their fellow gang members will back them up, and will help enhance their reputation within and outside the gang by bearing witness to their crimes. (*Albillar, supra*, 51 Cal.4th at pp. 60–63.) Thus, there was "substantial evidence that [the] defendants came together *as gang members* to attack [the victim] and, thus, that they committed these crimes in association with the gang. [Citations.]" (*Id.* at p. 62, original italics.) By the same token, the finding that the rapes were committed with the specific intent to promote, further, or assist criminal conduct by the other gang members present was supported by the "ample evidence that [the]

the court concluded that a violation of the statute is established when the defendant gang member promotes, furthers, or assists *any* felonious conduct by gang members, even when that conduct itself is not shown to have been gang related. (*Albillar, supra*, 51 Cal.4th at pp. 54–59.)

defendants intended to attack [the victim], that they assisted each other in raping her, and that they were each members of the criminal street gang." (*Id.* at p. 68.)

The instant case is far different factually from *Albillar, supra,* 51 Cal.4th 47. As to the robbery with which appellant was charged, there is no evidence that he acted in concert with his companions. Appellant's companions left the store before he picked up the liquor bottle, and they did not assist him in assaulting Chamblee. Indeed, there is no evidence in the record that appellant's companions even saw what happened in the store after they left. Moreover, there is no evidence that Chamblee was aware that appellant, or his companions who had been in the store earlier, were gang members or "affiliates." Thus, most of the factors that the Supreme Court relied on to support the gang enhancement in *Albillar* are absent from the present case.

The parties have cited several additional cases in their briefs that warrant discussion for comparison to the evidence adduced below. Like our case, those cited cases involved challenges to the sufficiency of the evidence to support an enhancement under the gang enhancement statute. In *People v. Morales* (2003) 112 Cal.App.4th 1176 [5 Cal.Rptr.3d 615] (*Morales*), although the defendant denied being a gang member at the time of his crime, he had several gang tattoos, and admitted answering to a nickname listed in a gang rollcall written in a book in his bedroom and on a fence in his backyard. (*Id.* at p. 1183.) In association with two other gang members, the defendant entered a home to deliver some methamphetamine. Once inside, the defendant robbed his customer at gunpoint. The other gang members who were with the defendant robbed two other men in the home, and shot and killed one of the victims when he resisted. The defendant admitted that he entered the home in order to sell methamphetamine to one of the occupants, and that he asked the other men to accompany him. He denied robbing his drug customer, however, and claimed to have been surprised by the actions of his companions in robbing and shooting the other occupants of the home while he was in another room. (*Id.* at pp. 1182–1183.) The prosecution's expert opined, in answer to a hypothetical question, that given the facts of the defendant's case (i.e., a robbery and murder carried out by several gang members acting in concert), the crime would have been committed for the benefit of, or at the direction of, or in association with, the gang. (*Id.* at pp. 1179–1183.)

The appellate court concluded that there was substantial evidence to support the first element of the enhancement, because "the jury could reasonably infer the requisite association from the very fact that [the] defendant committed the charged crimes in association with fellow gang members." (*Morales, supra,* 112 Cal.App.4th at p. 1198.) In the present case,

the juvenile court expressly found that appellant himself, though not a gang member, was an affiliate.[10] As noted *ante*, the juvenile court's finding on this element is supported by substantial evidence.

As to the second element, the *Morales* court was careful to note that "specific intent to benefit the *gang* is not required. What is required is the 'specific intent to promote, further, or assist in any criminal conduct *by gang members* . . . .' " (*Morales, supra*, 112 Cal.App.4th at p. 1198, italics omitted & added.) In that case, there was evidence that the defendant intended to commit crimes in association with persons he knew were gang members, and that he intended to aid and abet the other gang members in the robberies they committed. Thus, "[i]t was fairly inferable that he intended to assist criminal conduct by his fellow gang members." (*Ibid.*)

Unlike *Morales, supra*, 112 Cal.App.4th 1176, and *Albillar, supra*, 51 Cal.4th 47, in the present case there was no evidence in the record that Holmes, Pinochi, or Midgett committed or were charged with *any* crime in connection with appellant's theft of the liquor bottle from the supermarket. Thus, it cannot be inferred from the facts and circumstances of appellant's crime, standing alone, that his purpose in committing it was to promote, further, or assist criminal conduct by gang members.

*In re Frank S., supra*, 141 Cal.App.4th 1192, is also instructive as to the intent element of the gang enhancement statute, and is more comparable factually to the present case than is *Morales, supra*, 112 Cal.App.4th 1176. In that case, a minor riding a bicycle ran a red light and was stopped by a police officer. A search revealed that the minor was carrying a knife, a small quantity of methamphetamine, and a red bandana. The minor told the officer that he was carrying the knife for protection against " 'the Southerners' " who believed he supported the "northern street gangs." He also admitted having "several friends in the northern gangs." (*Id.* at p. 1195.) At the minor's trial, the prosecution presented the testimony of a gang expert who testified about the local Norteño gangs. The expert opined that the minor was an active Norteño, on the basis of his possession of a red bandana; his description of himself as a Norteño affiliate during his intake at a juvenile detention facility; and his explanation that he carried the knife for protection against "Southerners." The expert also testified that the minor's possession of the knife

---

[10] Swift, the prosecution's gang expert, explained the difference between an "active gang participant" (which he used synonymously with the statutory term "member") and a gang "affiliate" as follows: "An active gang participant, we have criterias [*sic*] that we look at and we base the opinion on. Anywhere from self-admission and custody to gang clothing to gang crime, and then looking at the totality of those. So if we have all of those, we can say that [a person] is an active gang participant. If we don't have all of those criterias [*sic*], [but] we have someone that associates with other . . . gang members, then he's considered an affiliate."

benefited the Norteños by "help[ing to] provide them protection should they be assaulted." (*Id.* at pp. 1195–1196.)

On appeal, the minor argued that the gang enhancement imposed on the basis of the expert's testimony was not supported by substantial evidence, and the Court of Appeal agreed. The court acknowledged that the evidence was sufficient to establish that the minor was affiliated with the Norteños, but "membership alone does not prove a specific intent . . . to promote, further, or assist in criminal conduct by gang members. [Citation.]" (*In re Frank S., supra*, 141 Cal.App.4th at p. 1199.) The court opined that "nothing besides weak inferences and hypotheticals show[ed] the minor had a gang-related purpose for the knife" (*ibid.*), and noted that it was improper for the expert to express an opinion as to the minor's specific intent in possessing the knife, which was "an issue reserved to the trier of fact" (*ibid.*). The court expressed concern that to allow the imposition of a gang enhancement based solely on expert testimony as to intent "opens the door for prosecutors to enhance many felonies as gang-related and extends the purpose of the statute beyond what the Legislature intended." (*Ibid.*)

Here, Swift based his opinion that appellant committed the robbery to further the interests of the Norteño gang on the premise that it was a violent crime, and gangs commit violent crimes in order to gain respect and to intimidate others in their community. But, nothing in the record indicates that appellant or his companions did anything while in the supermarket to identify themselves with any gang, other than wearing clothing with red on it. No gang signs or words were used, and there was no evidence that Chamblee or any of the other persons who witnessed the crime knew that gang members or affiliates were involved. Therefore, the crime could not have enhanced respect for the gang members or intimidated others in their community, as suggested by Swift.

Also, there is no evidence that appellant or his companions entered the store with the intention of committing a violent crime. Had Chamblee not intervened, it appears from the record that appellant simply planned to walk through the unattended cash register with the bottle, without paying for it, and to leave the store. Indeed, the juvenile court expressly found that the breaking of the bottle was "happenstance," and attributed appellant's crime to his "disrespect for the property rights of others coupled with a violent—an explosive personality that tends to act out violently." In other words, the juvenile court was persuaded that appellant's assault on Chamblee was simply a spur-of-the-moment reaction to Chamblee's attempt to grab the bottle from him.

Thus, the underlying premise of Swift's opinion, that the participants planned or executed a violent crime in concert in order to enhance their

respect in the community, or to instill fear, was factually incorrect. An " 'expert's opinion is no better than the facts on which it is based.' [Citation.]" (*People v. Gardeley, supra,* 14 Cal.4th at p. 618.)

We also are not persuaded that the alternative approach taken by Swift on cross-examination provided substantial evidence supporting the court's finding. When pressed by appellant's counsel, Swift opined that even if appellant had successfully shoplifted the bottle of liquor, this still would have benefited the gang by showing that appellant was willing to "putting in work" to commit a crime, and to obtain alcohol for gang affiliates who were underage.

It is unclear what the expert intended by his broadly worded comment about "putting in work" to commit a crime, and how his opinion in this regard drew any distinction between crimes in general and crimes carried out with the specific intent to promote, further, or assist gang activity. We agree with the court in *In re Frank S.* that such general opinion testimony as to intent "opens the door for prosecutors to enhance many felonies as gang-related" (*In re Frank S., supra,* 141 Cal.App.4th at p. 1199), by expanding the gang enhancement statute to cover virtually *any* crime committed by someone while in the company of gang affiliates, no matter how minor the crime, and no matter how tenuous its connection with gang members or core gang activities. "Such a holding would convert section 186.22(b)(1) into a general intent crime. The statute does not allow that. [Citations.]" (*People v. Ramon* (2009) 175 Cal.App.4th 843, 853 [96 Cal.Rptr.3d 459] [fact that defendant was with another gang member and in gang territory when he drove a stolen vehicle with an unregistered firearm inside did not justify imposition of gang enhancement; those facts were not sufficient to support expert's testimony that crimes were committed for benefit of gang].) We also reject the notion that stealing a bottle of liquor to drink with companions is, in itself, sufficient to support a conclusion that the theft was intended to promote, further or assist criminal conduct by gang members.

Therefore, Swift's opinion testimony is not substantial evidence to support a finding of proof beyond a reasonable doubt that appellant committed the robbery with the specific intent to promote, further, or assist criminal activity by gang members. (Cf. *People v. Ochoa* (2009) 179 Cal.App.4th 650, 663 [102 Cal.Rptr.3d 108] [where defendant gang member committed carjacking unaccompanied, without displaying gang signs or other indications of gang affiliation, expert opinion that crime was committed to benefit gang was insufficient to support imposition of gang enhancement].) Accordingly, the juvenile court erred in finding the gang enhancement allegation true.

## IV. Disposition

The judgment is reversed insofar as it reflects a true finding as to the gang enhancement, and otherwise affirmed. The matter is remanded to the juvenile court for a rehearing on disposition, including the maximum term of confinement, and for reconsideration of the order directing appellant to register as a gang member.

Sepulveda, J., and Rivera, J., concurred.