Filed 1/6/14  P. v. Trinh CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B242635 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA380215) |
| v. | |
| DWIGHT ANDRE TRINH, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, William C. Ryan, Judge.  Affirmed.

Siri Shetty, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Paul M. Roadarmel, Jr. and Robert C. Schneider, Deputy Attorneys General, for Plaintiff and Respondent.

Dwight A. Trihn appeals the judgment entered following a jury trial in which he was convicted of shooting at an occupied motor vehicle with findings he personally used a firearm and personally and intentionally discharged a firearm (Pen. Code, §§ 246, 12022.53, subds. (b) & (c); count 1),[1] assault with a semiautomatic firearm with a finding he personally used a firearm (§§ 245, subd. (b), 12022.5, subd. (a); count 2) and felon possessing a firearm (§ 12021, subd. (a)(1); count 3). The jury made findings each offense was committed for the benefit of, or in association with, a criminal street gang. (§ 186.22, subds. (b)(1) & (b)(4)(B).) Appellant admitted that he had a prior conviction for attempted murder (§§ 664, 187) that was a serious felony (§ 667, subd. (a)(1)) and a strike (§§ 667, subds. (b)-(i), 1170.12, subds. (a)-(d)), and for which he had served a separate prison term (§ 667.5, subd. (b)).

At sentencing, the trial court imposed an aggregate term of 55 years to life in state prison. For count 1, shooting at an occupied motor vehicle, the trial court imposed a doubled base term of 15 years to life, or 30 years to life, with a consecutive determinate term of five years for the prior violent felony conviction and of 20 years for the use of a firearm, a term of 55 years to life. For count 3, felon in possession of a firearm, the trial court imposed a concurrent term of seven years. The term imposed for count 2 was imposed and stayed pursuant to section 654.

## BACKGROUND

Hector Medina owned a small bar and a separate restaurant, Casa Honduras, on the frontage road on the northeast corner of 68th Street and Vermont Avenue in Los Angeles. His residence was located on 68th Street behind the bar, or "club," as he referred to the bar. The club was a local gang hangout for the 65 Menlo Gangster Crips (Menlo) and their associate gang, the 67 Neighborhood Crips. One of the Menlos, appellant, known by his first name, Dwight, or as Dough Boy, frequented the club. Appellant often organized gang

---

[1]    All further references are to the Penal Code unless otherwise indicated.

2

parties at the club, and he and Medina would collect the proceeds of the parties at the door and split those proceeds. Medina did not employ appellant.

At 9:00 p.m. on December 26, 2010, appellant had organized a birthday party for a fellow gang member, Ranbo. Ranbo, appellant and several other gang members were present inside the club preparing for the party. Appellant was standing inside the front door to the club making a cellular telephone call when a car drove by the club northbound. A rear passenger in the car rolled down a window and started shooting in the direction of the front of the club with a rifle-shaped gun. Appellant could be seen on a video surveillance tape at the front of the club emerging outside with his .38-caliber semiautomatic pistol and chasing the drive-by car northbound. While appellant ran, he returned fire at the departing drive-by vehicle.

After the shooting, appellant did not return to the club, and the police arrived. Medina and the police determined the gunman in the drive-by vehicle was not shooting bullets at the club. They found paint balls sitting on two cars parked in front of the club and concluded the rear occupant of the drive-by vehicle was discharging a paint gun. Appellant was later arrested for the shooting.[2]

---

[2] Medina was a reluctant witness. He did not want to displease appellant or the police, and he was afraid of appellant and the Menlo gang. He was concerned for his family's safety as they lived in the residence located behind the club. Medina initially declined to identify appellant on the video surveillance tape and said appellant was not at the club. Medina admittedly had been in contact with appellant who was telephoning Medina from the jail. Through direct threats and threats by other gang members, appellant attempted to shape, and did partially have an effect on, Medina's preliminary hearing and trial testimony. The above version of the shooting was established at trial through Medina's trial testimony and his extrajudicial statements to Los Angeles police officers, particularly Los Angeles Police Officer Stephen McClean (Officer McClean). By the time of trial, Medina had moved his family from the residence he owned behind the club. Before the preliminary hearing, Medina made a claim that a Jose Marin, a Huntington Park business rival, had threatened Medina with violence. The police did not regard this latter claim as credible.

The police were unable to obtain any reliable indication of the identity of the occupants of the drive-by vehicle. Thus, they were unable to determine whether the occupants of the drive-by car were rival gang members and whether the drive-by shooting was gang activity. Nevertheless, appellant was arrested for participating in a retaliatory gang shooting as he had returned fire at the occupied drive-by vehicle. At trial, the jury found him guilty of the shooting and returned a true finding as to a section 186.22, subdivision (b), gang enhancement.

Officer McClean testified to the opinion evidence necessary to provide the basis for the gang enhancement. He opined Menlo was a criminal street gang and gave the reasons why he had so concluded. He testified to gang mores and expectations. He opined appellant was an active Menlo gang member, and he explained gang intimidation of witnesses and of peers and the community generally. He explained why carrying a firearm and using that firearm in retaliation elevated the gang's status and the particular gang member's reputation. The officer described the concept of retaliation and that engaging in a retaliatory shooting would elevate status within the gang and would assist the gang's reputation. Hypothetically, the officer gave his opinion the shooting was committed in association with the gang and for its benefit as carrying the firearm and committing the shooting showed disregard for the law, an element of the gangster lifestyle, and allowed the gang member to assist the gang in maintaining its control over the neighborhood.

## CONTENTIONS

1. *The Sufficiency of the Evidence Supporting a Gang Enhancement*

Appellant contends the evidence is insufficient to support the finding of a gang enhancement pursuant to section 186.22, subdivision (b). He argues there is no evidence the drive-by shooting was gang-related, or that appellant acted with the assistance of other gang members, and thus appellant is not liable for the gang enhancement. He urges "the record . . . failed to disclose a rational inference [appellant's] actions benefited the . . . gang or that he harbored the specific intent to promote [the] felonious activity of gang members," and "no evidence [but] speculation from a gang expert" suggested the crime

4

"was committed for the benefit [of the gang] with the specific intent to aid criminal conduct of gang members."

### a. *The standard of review for sufficiency of the evidence*

In considering a challenge to the sufficiency of the evidence to support an enhancement, " ' "we review the [entire] record in the light most favorable to the judgment to determine whether it [contains] substantial evidence -- that is, evidence that is reasonable, credible, and of solid value -- from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.]" ' " (*People v. Wilson* (2008) 44 Cal.4th 758, 806.) We presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence. (*Ibid.*) If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding. (*People v. Lindberg* (2008) 45 Cal.4th 1, 27.) " 'A reviewing court neither reweighs evidence nor reevaluates a witness's credibility.' (*Ibid.*)" *(People v. Albillar* (2010) 51 Cal.4th 47, 59-60 (*Albillar*).)

Substantial evidence includes circumstantial evidence and the reasonable inferences this evidence allows. (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11; *People v. Ferraez* (2003) 112 Cal.App.4th 925, 930.) "Although the jury is required to acquit a criminal defendant if it finds the evidence susceptible of two reasonable interpretations, one of which favors guilt and the other innocence, it is the jury, not the appellate court, which must be convinced of his guilt beyond a reasonable doubt." (*People v. Millwee* (1998) 18 Cal.4th 96, 132.)

### b. *The other relevant legal principles*

Section186.22, subdivision (b)(1), is an enhancement which provides "any person who is convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members, shall, upon conviction of that felony,

[be punished] in addition and consecutive to the punishment prescribed for the felony or attempted felony of which he or she has been convicted . . . ." (§ 186.22, subd. (b)(1).)

"[T]to fall within the statutory definition of a 'criminal street gang,' there must be an ongoing association of at least three persons that has as one of its primary activities the commission of specific types of criminal activity, uses a common name or identifying sign or symbol, and has members who individually or collectively have actually engaged in 'two or more' acts of specified criminal conduct committed either on separate occasions or by two or more persons."
(*People v. Gardeley* (1996) 14 Cal.4th 605, 623 (*Gardeley*).)

The gang enhancement does not punish mere gang membership. (*Gardeley*, *supra*, 14 Cal.4th at p. 623.) To be punishable pursuant to section 186.22, subdivision (b)(1), the offense must be "gang-related," i.e., it must be committed (a) for the benefit of, (b) at the direction of, or (c) in association with a criminal street gang. (*Albillar*, *supra*, 51 Cal.4th at p. 60.) The second prong of the gang enhancement requires a defendant commit the gang-related felony with the specific intent to promote, further, or assist in *any* criminal conduct by gang members -- including the current offenses -- and not merely *other* criminal conduct by gang members. (*Id*. at p. 65.) There is no statutory requirement this " ' "criminal conduct by gang members" be distinct from the charged offense, or that the evidence establish specific crimes the defendant intended to assist his fellow gang members in committing.' [Citation.]" (*Id*. at p. 66.)

The disjunctively worded subparts of each element provide separate and alternative means to satisfy the two statutory elements. (*People v. Leon* (2008) 161 Cal.App.4th 149, 162.)

A gang-related felony is required for the initial prong of the enhancement, but not for the latter specific intent prong. "There is no further requirement that the defendant act with the specific intent to promote, further, or assist a *gang*; the statute only requires the specific intent to promote, further, or assist criminal conduct by *gang members*." (*Albillar, supra,* 51 Cal.4th at p. 67.) Gang membership is not a requirement for the

6

enhancement; the defendant is liable where a defendant "personally commit[s] a gang-related felony with the specific intent to aid members of that gang." (*Id*. at p. 68.)

"There is rarely direct evidence that a crime was committed for the benefit of a gang. For this reason, 'we routinely draw inferences about intent from the predictable results of action. We cannot look into people's minds directly to see their purposes. We can discover mental state only from how people act and what they say.' [Citation.]" (*People v. Miranda* (2011) 192 Cal.App.4th 398, 411-412.) Thus, circumstantial evidence of specific intent is sufficient. Additionally, if substantial evidence otherwise establishes that the offense is gang-related, the jury reasonably may infer that the defendant had the specific intent to promote, further, or assist any criminal conduct by gang members. (*Albillar, supra*, 51 Cal.4th at pp. 67-68.)

c. *Expert opinion*

In *People v. Garcia* (2007) 153 Cal.App.4th 1499, at pages 1512 to 1513, the court summarized the general rules concerning the use of expert police officer opinion evidence for proving a gang enhancement.

" 'As a general rule, a trial court has wide discretion to admit or exclude expert testimony. [Citations.] An appellate court may not interfere with the exercise of that discretion unless it is clearly abused. [Citation.]' ' (*People v. Valdez* (1997) 58 Cal.App.4th 494, 506 (*Valdez*).) In cases where a gang enhancement is alleged or a substantive gang crime is charged, expert testimony regarding the "culture, habits, and psychology of gangs" is generally permissible because these subjects are " 'sufficiently beyond common experience that the opinion of an expert would assist the trier of fact.' " (*Ibid*.) For example, an expert may properly testify about the size, composition, or existence of a gang; "motivation for a particular crime, generally retaliation or intimidation"; and "whether and how a crime was committed to benefit or promote a gang." (*People v. Killebrew* (2002) 103 Cal.App.4th 644, 656-658; see *People v. Gonzalez* (2005) 126 Cal.App.4th 1539, 1550 ["Expert testimony repeatedly has been offered to show the 'motivation for a particular crime, generally retaliation or intimidation' and

7

'whether and how a crime was committed to benefit or promote a gang' "]; *Valdez,* at pp. 507-509 [holding expert opinion concerning whether the defendant acted for the benefit of a gang was admissible under the circumstances of the case].)

Expert opinion that particular criminal conduct benefited a gang by enhancing its reputation for viciousness can be sufficient to raise an inference that the conduct was committed for the benefit of a criminal street gang. (*Albillar*, *supra*, 51 Cal.4th at p. 63, citing *People v. Vazquez* (2009) 178 Cal.App.4th 347, 354 [relying on expert opinion that the murder of a non-gang member benefited the gang because "violent crimes like murder elevate the status of the gang within gang culture and intimidate neighborhood residents who are, as a result, 'fearful to come forward, assist law enforcement, testify in court, or even report crimes that they're victims of for fear that they may be the gang's next victim or at least retaliated on by that gang . . .' "] and *People v. Romero* (2006) 140 Cal.App.4th 15, 19 [relying on expert opinion that "a shooting of any African-American men would elevate the status of the shooters and their entire [Latino] gang"].)

> d. *Officer McClean's trial testimony*

Officer McClean had had personal contact with appellant recently on 15 occasions. During those contacts, appellant admitted his Menlo gang membership and freely discussed gang matters. Appellant's torso, arms and legs were covered with gang tattoos, many of which indicated that he was a Menlo gang member. Appellant's moniker was Dough Boy. Officer McClean believed that appellant was an active gang member based on appellant's association with other Menlo gang members, his admissions of gang membership and the location where he hung out.

During the investigation of the shooting, Officer McClean had listened to hours of the recorded telephone calls appellant had made from the jail. During the telephone calls appellant made to other gang members, appellant and the other parties punctuated their conversations with such sayings as "Hey, Lo" or "Menlos," or said such things as "Lo's up," indicating they were Menlo gang members.

The officer gave his opinion the Menlo Crips were a criminal street gang and the basis for his opinion. The officer explained the 60 members of the Menlo gang associate with the 67 Neighborhood Crips as they are both relatively smaller gangs. They are rivals to the bordering gangs, the Six-Deuce Brims, the Eight-Trey Gangster Crips and several Hoover gangs. Rivalry between criminal street gangs, such as Menlo, often lead to violence. The Menlo gang was territorial, their center being Menlo Avenue and 65th Street. Their territory's northern border is Gage Avenue, the southern border is Florence Avenue, the western boundary is Vermont Avenue, and the northern border is Hoover Street.

The Menlos have a unique hand sign, which the officer demonstrated, and their primary color is dark blue. They wear sports items in the colors of the University of Michigan Wolverines, which display the letter M. They have other written signs, such as, "LO," "M-G-C," "65" and "LXV." The gang established its territory by posting graffiti and threatening and fighting with, or shooting at, others who enter their territory.

The officer gave the details of two 2009 crimes committed by fellow gang members Drew Pollard and Caprice Thompson.

Officer McClean testified that when an individual joins a gang he gives up a measure of personal autonomy. His actions are not merely self-centered. His acts represent the gang as well as himself. Retaliation is part of the gang culture. A gang member's status within the gang is measured to some extent by his willingness to engage in violence, particularly in retaliating against anyone who gives the gang offense. An act of retaliation would brand a gang member a coward. An act of retaliation by an individual gang member benefited the reputation of the gang as a whole.

Officer McClean explained the Menlo gang's primary activities were narcotic sales, robberies, burglaries and assaults. He elaborated that a gun is a "tool of the trade" for a criminal street gang member. Gang members carry guns to commit crimes, establish their identity and effect fear and intimidation in peers and within the community. Gang crimes often involve firearms. Officer McClean said Menlo gang members carry guns even in

9

their own territory. They do so to protect themselves, their neighborhood, and to enforce boundaries with respect to rivals. They use firearms more offensively than defensively.

The more serious or violent a crime or crimes a gang member commits, the higher the gang member's status is within the gang. Gang members equate fear with respect. Thus, the more one is feared, the more one is respected. If you go around beating others up, terrorizing others and shooting at people, you make a name for yourself within the gang, and your status is elevated.

Also, gang members have rank in the gang based on the "work [they] put in." The more crimes and other work one does for the gang's benefit, the higher one's rank. One starts as a teenager performing lowly duties. Then, when the gang member is old enough, he becomes an "O.G.," a "gang Crip," and he directs the younger gang members. In Officer McClean's opinion, appellant was a "soldier." He was not quite an "O.G.," but his status was high. He was a "warrior," and others worked under him. According to statements appellant made during the recorded telephone calls, it appeared appellant had recently changed his moniker to "Big D Capone." In one jail telephone call, appellant directed other gang members "Baby D Capone," otherwise known as "Lavelle," was to be regarded as his representative in the neighborhood. Appellant indicated Lavelle's directions were to be considered as directions from appellant.

The officer testified to the gang concept of "retaliation." He said if another gang slights a gang member in some way, or "disrespects" a gang member, gang members must "step up" and retaliate. If not, the gang member will be branded a coward. One's status within the gang will be lowered until he is kicked out of the gang. One's status in the gang depends on his reputation and the respect he has from others.

Officer McClean said engaging in a shooting elevates a gang member's status with the other gang members. A shooting gave one bragging rights, i.e., the gang member could brag in order to enhance his reputation.

10

Retaliation is part of the gang culture. If a gang member goes out and commits an act of retaliation, it is regarded as benefitting the gang and is not necessarily done with selfish motives. Everything a gang member does is for the gang. If someone fails to commit a violent act in retribution, it lowers the status of the entire gang. Word spreads, and if a particular gang member is not feared, he fails to get respect.

The prosecutor asked Officer McClean a hypothetical loosely based on the facts of appellant's case. The officer opined the gang member who returned shots in response to a paintball shooting would be acting for the benefit of, and in association with, the gang. If a gang member is a senior person in the gang, he considers himself a warrior. He has to live up to his reputation. If someone shoots at him, it is expected he will pull out his own gun and return fire, that is, he is required to "step up" and "take care of business." Everyone will see he did a good job, and his status is retained and elevated within the gang. To fail to respond would brand the gang member a coward and very significantly lower his status.

Immediately retaliating also lets rival gang members know that the Menlos protect their neighborhood. It becomes widely known if an interloper tries to "disrespect" the gang, the gang will meet violence with violence. The officer said, "It ups the level of violence and the fear that's going on in their neighborhood." The gang member may be defending himself, but he is also defending the gang.

Officer McClean opined the instant shooting was committed in association with the gang. The club was a known hangout where a gang party soon would be taking place. By carrying a gun within the club, the gang member was maintaining the gang's status. The gang members were carrying on their business in the community with impunity. It is against the law for a gang member to own or possess a firearm. So a gang member carrying a firearm demonstrates a certain disregard for the law, an element of living a gangster lifestyle. Possessing the firearm also allowed the gang member to protect the gang in the neighborhood.

The officer explained the factors that persuaded him of a benefit to the gang. Appellant was a gang member at a gang function in a well-known gang location within the territorial boundaries of the gang. He was carrying a firearm when he was prohibited from possessing it. He was a gang member carrying a gun for the benefit of the gang, and additionally, he used that gun. The officer claimed it was irrelevant that the drive-by shooting was committed with a paintball gun. Appellant's act of shooting at the drive-by vehicle was committed in association with the gang because the drive-by gunman was "disrespecting" the Menlo gang, whether drive-by gunman used a real gun or not. In the gang culture, that sort of an attack called for violent retaliation.

Appellant's recorded jail telephone calls indicated he is currently an active gang member. Appellant's arrest and incarceration for the retaliatory shooting would only enhance appellant's reputation within the gang. Gang membership is a particular lifestyle, a life of crime.

e. *The analysis*

Appellant makes no claim Menlo is not a criminal street gang. Accordingly, we do not discuss that aspect of Officer McClean's testimony.

(1) *Committing an offense alone*

At the outset, we note that in the recent decision of *People v. Rodriquez* (2012) 55 Cal.4th 1125 (*Rodriguez*), the court addressed the elements of the substantive gang offense in section 186.22, subdivision (a). In so doing, the court observed that the elements of the substantive offense and the instant enhancement, section 186.22, subdivision (b)(1), are different. The court explained while the substantive offense requires collective action, the enhancement does not. The court indicated for the enhancement, a person may act alone and still be subject to the finding of a gang enhancement. (See *Rodriquez*, at pp. 1138-1139; see also conc. op. by Baxter, J., at pp. 1139-1141.) The court observed there is no multiple actor requirement as there is for the substantive gang offense. (See *Rodriquez,* at pp. 1134-1135.) The enhancement

12

applies when a defendant personally commits a gang-related felony with the specific intent to promote, further, or assist a gang. (*Albillar, supra*, 51 Cal.4th at pp. 67-68.)

Although the *Rodriguez* court's comments on this point are dicta, the Supreme Court's dicta generally should be followed, particularly "[w]hen the Supreme Court has conducted a thorough analysis of the issues and such analysis reflects compelling logic," as occurs in *Rodriquez*. (*Hubbard v. Superior Court* (1997) 66 Cal.App.4th 1163, 1169.)

Thus, this court concludes the fact appellant acted alone creates no bar to the finding of the gang enhancement.

### (2) *Gang-related felony*

Appellant argues there is inadequate proof of a gang-related felony, the first prong or element of the enhancement. However, Officer McClean testified the offense was gang-related because appellant's retaliatory shooting benefited the gang and also was conducted in association with the gang. It was irrelevant the police were unable to determine the identity of the occupants of the drive-by car in order to determine whether the drive-by assailants were involved in gang activity. What is determinative of the initial element of the enhancement is whether appellant's conduct benefited the gang.

For several years, Officer McClean had been working the gang detail in the gang's general area. Thus, many of Officer's McClean's observations about the Menlo gang were grounded in his personal knowledge of the gang activity in that area. The officer testified the club was a well-known gang hangout. Many gang shootings and attacks had occurred there, as well as several deaths. Medina agreed with the officer's evaluation his club was a well-known gang hangout and additionally testified there had been a prior drive-by shooting just two weeks prior to the instant shooting.

The officer testified as to how the gang protected its territory by using violence and would attempt to meet each violent attack on persons within its territory with immediate violence. The carrying of a gun in defiance of the law and to meet retaliatory or drive-by shootings was part of the gang lifestyle. Being prepared for and meeting an attack

13

benefited the individual gang member and the gang. Appellant's status as an almost-O.G. demanded his action in response to the paint ball shooting.

Expert testimony regarding the " 'culture, habits and psychology of gangs' is generally permissible because these subjects are ' "sufficiently beyond common experience that the opinion of an expert would assist the trier of fact." ' " (*People v. Garcia* (2007) 153 Cal.App.4th 1499, 1512.) Officer McClean's testimony about gang values and the mores of retaliation and respect amply supports the first prong of the enhancement. It explains for the jury the gang and gang member's motivations and gang culture so jurors could reach their own conclusions with respect to whether appellant acted to benefit the gang or in association with the gang.

The decisions in *People v. Ochoa* (2009) 179 Cal.App.4th 650 (*Ochoa*) and *In re Daniel C.* (2011) 195 Cal.App.4th 1350 (*Daniel C.*) are distinguishable.

In *Ochoa*, a gang member carjacked a car from a passenger parked in a fast food restaurant's parking lot. During the crime, there was no objective indicia the carjacker was a gang member. The gang expert testified "the carjacking would benefit the gang by providing general transportation to the gang's members, by enabling transportation of narcotics for sale by the gang, by enabling transportation to commit further crimes by the gang, by providing economic benefit to the gang by sale of the vehicle, by elevating defendant's status within the gang, and by raising the gang's reputation in the community." (*Ochoa*, *supra*, 179 Cal.App.4th at p. 656.)

However, in *Ochoa*, there were no foundational facts adduced at trial tending to prove the carjacking was gang-related. (*Ochoa, supra*, 179 Cal.App.4th at pp. 659-663.) The defendant did immediately drive the car to another location and used the gun to intimidate another person. However, no witness testified this latter use of the firearm was gang-related or of benefit to the gang. (*Id*. at p. 654-663.) In the instant case, appellant had no personal motive to participate in the shooting, except that he was affiliated with the gang, at the gang's hangout, and protecting his neighborhood. Retaliatory drive-by

14

shootings, such as that engaged in by appellant, do not usually occur outside the gang context. (*Id*. at p. 661.)

In *Daniel C*., *supra*, 195 Cal.App.4th 1350, three youths entered a market. Two of the young men then walked outside. The third youth, Daniel C., hung back. A market employee saw Daniel C. pick up a bottle of bourbon and walk out the exit without paying for it. When confronted outside the supermarket, Daniel C. assaulted the employee with the bottle and used its broken neck to cut the employee's ear. The three youths and a driver of a car were detained. (*Id.* at pp. 1353-1354.)

One of the youths claimed the three youths entered the market to get liquor but the other two denied that was their purpose. Daniel C. said he went there to get alcohol even though he had no money, and he told the officer the other youths were unaware of his intent. (*Daniel C., supra*, 195 Cal.App.4th at p. 1354.) At the adjudication, Daniel C. claimed that he only knew one other youth in the car, there was no gang purpose underlying the commission of the crime, and he stole the liquor bottle on impulse. (*Id*. at p. 1357.) He was not a gang member. (*Ibid*.)

An expert police officer opined the robbery was gang-related and Daniel C. was a gang member based on his association with other youths with gang affiliations. The expert claimed one youth at the market with Daniel C. was an active gang member; another was an "affiliate." (*Daniel C., supra*, 195 Cal.App.4th at p. 1355.) The youths each wore some item of clothing that was red, a gang color. They had coordinated their activities in the market. (*Id*. at p. 1356.) The expert opined the commission of violent crimes benefited the perpetrator because it raised his level of respect and status within the gang. Also, the theft of the bourbon benefited the gang and Daniel C. because it showed appellant and his companions "were 'putting in work' " for the gang. (*Ibid*.)

In *Daniel C*., the appellate court found the foundational facts in the trial evidence insufficient to support the expert's opinions concerning the gang enhancement. It held there was no evidence the other youths were aware of what Daniel C. was doing or that the various youths referred to by the gang expert were actually gang members.

(*Daniel C., supra*, 195 Cal.App.4th at p. 1361.)  In our case, there was no true dispute concerning the foundational facts that appellant was a gang member, present with several other gang members inside the bar, and the club was the well-known location of various incidents of gang activity.  The evidence supports the gang enhancement as appellant had no personal motive for his quick response to the drive-by shooting as he was sheltered inside the outside door to the bar and emerged only after the drive-by vehicle was driving off.  Circumstantially, the only way to explain his conduct was that he was acting in general conformity to well-known gang mores by retaliating for the drive-by shooting.  Officer McClean was assigned to work an adjacent area and had considerable personal knowledge about the Menlo gang and its members.

(3)  *Specific Intent*

In this case, the evidence additionally supports the intent element, or the second prong, of the enhancement:  that appellant act to promote, further or assist criminal conduct by gang members.

Circumstantial evidence of intent is sufficient to demonstrate this prong of the enhancement.  (*People v. Miranda*, *supra*, 192 Cal.App.4th at pp. 411-412.)  When appellant took out his gun to retaliate for the disrespect the paint-ball shooter was showing to his gang and its territory, he was aiding members of his gang.  He acted to make it safer for gang members to hang out at that particular location by quickly retaliating with maximum force for the lack of respect shown to those who frequented the club. He benefited the gang by acting violently with a firearm, conduct which made it easier for gang members to act with impunity within the confines of the Menlo's gang territory. Circumstantially, from this evidence, the jury had ample evidence from which to conclude appellant retaliated with the intent to protect the territory of his gang, i.e., for the benefit of the gang.  That was all that was required to meet the intent, or second prong, of the enhancement.  (*Albillar, supra*, 51 Cal.4th at p. 68.)

16

2. *The Restitution Fines*

The People contend the restitution fines imposed are unauthorized, and accordingly, a remand to the trial court is necessary so as to reimpose restitution fines that fall within the statutory limits.

At the oral proceedings of judgment, the trial court imposed a restitution fine of $20,000 (§ 1202.4, subd. (b)) and a parole revocation restitution fine "in the same amount" (§ 1202.45), the parole restitution fine to be stayed until such time as appellant violated parole. However, the trial court's minute orders and abstract of judgment indicate that the trial court imposed restitution fines in a different amount, of $1,000 each.

The statutes limit the amount of a restitution or a parole restitution fine to $10,000. The latter minute order and abstract of judgment fines of $1,000 were within statutory limits, while the orders for $20,000 fines entered during the oral proceedings of judgment exceeded statutory limits.

As the maximum restitution fine that may be imposed is $10,000 for each of the restitution fines, we assume the trial court inadvertently erred in making the orders for the unauthorized restitution fines. Thereafter, the erroneous orders were brought to the trial court's attention. At that point, the trial court corrected its orders and had its clerk record the new authorized orders in its minutes and in the abstract of judgment. (See *People v. Smith* (1983) 33 Cal.3d 596, 599 [whether the recitals in the clerk's minutes should prevail as against contrary statements in the reporter's transcript, must depend upon the circumstances of each particular case].) Under the circumstances, we deem the minute order and abstract of judgment to prevail over the reporter's transcript. The erroneous statements in the reporter's transcript are of no effect.

As the minute order and the abstract of judgment contain the new orders of the trial court, and the fines imposed therein are authorized, there is no need for this court to order a remand for the trial court to once again reimpose fines within statutory limits. (See *People v. Cleveland* (2004) 32 Cal.4th 704, 768; *People v. Thompson* (2009) 180 Cal.App.4th 974, 978.)

17

**DISPOSITION**

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

KLEIN, P. J.

We concur:

CROSKEY, J.

ALDRICH, J.

18