Filed 8/4/21  P. v. Perez CA2/7

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION SEVEN

| | |
|---|---|
| THE PEOPLE, | B302245 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. NA108005) |
| v. | |
| GERARDO PEREZ et al., | |
| Defendants and Appellants. | |

APPEAL from judgments of the Superior Court of Los Angeles County, Richard M. Goul, Judge.  Affirmed.

Maggie Shrout, under appointment by the Court of Appeal, for Defendant and Appellant Gerardo Perez.

Lynda A. Romero, under appointment by the Court of Appeal, for Defendant and Appellant Juan Jose Bueno.

Xavier Becerra, Attorneys General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Roberta L. Davis and William H. Shin, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Codefendants Juan Jose Bueno and Gerardo Perez appeal from judgments entered after a jury convicted Bueno of second degree murder of Jesus Aleman and possession of a firearm by a felon and Perez of accessory after the fact. The jury also found true gang enhancement allegations as to both Bueno and Perez.

On appeal, Bueno and Perez contend the gang enhancement allegations were not supported by substantial evidence. They also contend the trial court abused its discretion in allowing the jury to view video from the body camera of a police officer who provided medical support to Aleman. Perez also argues the use of his prior juvenile adjudication as a strike for purposes of sentencing under the three strikes law (Pen. Code, §§ 667, subds. (b)-(i), 1170.12)[1] violated his constitutional right to a jury trial. We affirm.

**FACTUAL AND PROCEDURAL BACKGROUND**

A.  *The Evidence at Trial*
    1.  *The shooting of Jesus Aleman*
On December 4, 2017 Perez and his sister Tanya Perez[2] were living at their mother's home on East Q Street in the Wilmington area of Los Angeles. Perez's good friend Bueno, who was "like a cousin" to Tanya, was also at the home that day. Tanya knew that Perez and Bueno were both members of the West Side Wilmas street gang and Bueno's gang moniker was Terror.

---

[1]   All undesignated statutory references are to the Penal Code.

[2]   To avoid confusion, we refer to Tanya Perez as Tanya.

After 9:00 p.m. that evening Tanya was outside the house and saw Bueno, Perez, and Esmeralda Venegas talking on the street by Venegas's car. The street was dark. Another car arrived, which dropped Aleman off at the location. Bueno asked Aleman where he was from. When Aleman did not answer, Bueno shot him a "'couple of times.'"[3] Perez and Venegas were standing behind Bueno at the time, and Perez appeared to Tanya to be in shock. Immediately after the shooting, Bueno, Perez, and Venegas got into Venegas's car, and "'they just took off.'"

A few minutes later—at 9:39 p.m.—Tanya received a text message from Perez stating, "Ayy tell mom not to say shit." Between 9:47 and 9:49 p.m. the following exchanged occurred. At 9:47 p.m. Tanya responded, "U fucken stupid they looking for u guys[.]" Perez messaged Tanya back, "Don't tell em shit" and "Tell em you don't know what happen[.]" Tanya answered, "I saw everything." Perez wrote, "You just heard the gunshots" and "You better [not] say shit." Tanya did not receive any further messages from Perez that night.

Los Angeles Police Officer Jacob Maynard and his partner responded to the scene of the shooting at approximately 9:39 p.m. Officer Maynard found Aleman lying on the street, and a woman was performing chest compressions on him. Aleman was wearing a gray shirt and red beanie and appeared to have a gunshot

---

[3]     Tanya initially told the police an unidentified male shot Aleman, but she later admitted Bueno and Perez were involved, and she testified at the preliminary hearing that Bueno was the shooter. During her examination by the prosecutor at trial, Tanya testified she had no recollection of the shooting, and excerpts of her preliminary hearing testimony were read to the jury.

3

wound in the back of his head or neck. Officer Maynard called for an ambulance, and he and his partner continued with chest compressions. After about five minutes paramedics from the Los Angeles Fire Department arrived, and Aleman was transported to the hospital.

One minute and 50 seconds of a video recorded by Officer Maynard's body camera was played for the jury. The video shows Officer Maynard and his partner performing chest compressions and checking Aleman's pulse while Aleman was lying on his back on the street several feet from the curb. Blood was pooled beneath Aleman's head, and Aleman appeared to make some facial movements. Officer Maynard exclaimed, "He's got a pulse" and told Aleman, "Stay with me buddy." Officer Maynard is also seen removing the red beanie from Aleman's head as the officers looked for the wound.

Aleman never regained consciousness, and he died in the hospital on April 27, 2018. Los Angeles County deputy medical examiner Dr. Ajay Panchal conducted an autopsy and opined at trial that Aleman died of pneumonia as a consequence of gunshot wound trauma.

2. *The arrest of Perez and Bueno*

On December 4, 2017 at approximately 9:49 p.m. Long Beach Police Officer Douglas Hara was on routine patrol when he observed a brown Honda Accord with no lights on swerving as it traveled eastbound on Broadway in Long Beach. Officer Hara followed the car, then pulled it over to investigate suspected drunk driving. He called for backup because he could see there were multiple occupants in the car. Officer Hara arrested Venegas, the driver and registered owner of the car, for driving under the influence. Long Beach Police Officer Javier Sepulveda

4

instructed Bueno and Perez, who were seated in the back seat, to exit the vehicle.

After Bueno and Perez got out of the vehicle, Officer Sepulveda recovered a nine-millimeter Glock semiautomatic pistol with an empty 10-round magazine lying on the rear floorboard, which had been obscured by a plastic bag. Sepulveda booked the weapon into evidence and arrested Bueno and Perez. At the time Sepulveda was not aware of the shooting in Wilmington.

3. *The police investigation*

Los Angeles Police Detectives Jeffrey Tiffin and Boris Oliva responded to the scene of the shooting at approximately 12:50 a.m. on December 5, 2017. They photographed the scene and recovered several items of Aleman's blood-stained clothing on the street, including Aleman's red beanie. Detective Tiffin also recovered two expended bullets and nine 9-millimeter shell casings. Fadil Biraimah, a criminalist in the Los Angeles Police Department Firearms Analysis Unit, analyzed the casings and concluded they had been ejected from the gun recovered from the back seat of Venegas's vehicle.

Detective Oliva obtained surveillance video from two cameras located on a house on East Q Street down the block from the shooting. Footage from one of the cameras stamped between 9:23 and 9:36 p.m. on December 4 was played for the jury. The video shows three people milling around, then standing by or sitting in a parked car on East Q Street. At approximately 9:35 p.m. a car pulled up on the opposite side of the street, a passenger exited the car, and the car drove off. One of the people

standing by the car[4] walked halfway across the street toward the man who had just arrived, raised his arm, and fired numerous shots at the man. The shooter walked back to the parked car and entered the rear driver's seat. The car drove off without any lights at 9:36 p.m., leaving the victim lying in the street. Footage from the second camera shows a car with no lights on speeding down East Q Street and through a stop sign at the intersection with Baypoint Avenue at 9:36 p.m.

4. *The gang expert testimony*

Los Angeles Police Officer Robert Hargrove testified as the prosecution's gang expert. Officer Hargrove was assigned to the Harbor Division gang unit and was tasked with monitoring the West Side Wilmas criminal street gang for nearly nine years. Officer Hargrove testified the West Side Wilmas had approximately 400 documented members. The gang's territory was bordered by the 110 Freeway on the west, Avalon Boulevard on the east, Lomita Boulevard on the north, and John S. Gibson Street leading to the Port of Los Angeles on the south. The gang's three main rival gangs were the Harbor City Boys, Rancho San Pedro, and East Side Wilmas. The gang has several identifying signs and symbols, including the color blue, the cursive letter "W," the initials "WS" and "WSW," and the

---

[4] The shooter walked with a limp, and Officer Sepulveda testified he observed Bueno walking with a limp and complaining of a leg injury at the time of his arrest. Portions of the video also showed the shooter and his companion as they walked toward the surveillance camera. The shooter wore jeans and was larger than the other man, who was wearing shorts, consistent with the physical descriptions of Bueno and Perez given by the Long Beach Police officers.

6

number 23. The gang's primary activities included robberies, assaults with a deadly weapon, shootings, witness intimidation, possession of ammunition, carjacking, attempted carjacking, murder, and attempted murder. As part of his assignment, Officer Hargrove encountered West Side Wilmas gang members on numerous occasions during his investigation of these crimes.

Officer Hargrove testified that the location of the shooting on East Q Street was within the territory of the rival East Side Wilmas gang. In the Wilmington area, the East Side Wilmas are associated with the color red. Within gang culture, the question, "Where you from?" is a challenge rather than a question—when a gang member asks another person "where you from," the gang member is both challenging the other person to identify his or her gang membership and announcing the gang member's willingness to commit an act of violence, which could be as severe as a stabbing or shooting.

Officer Hargrove opined Bueno was a member of the West Side Wilmas gang with the moniker TK based on the officer's previous encounters with Bueno in which Bueno admitted he was a West Side Wilmas gang member; numerous gang tattoos on Bueno's shoulders, torso, arms, face, neck, and head; and Bueno's association with other known members of the gang. Hargrove likewise opined Venegas was a member of the West Side Wilmas gang with the moniker Kurious based on his previous encounters in which she admitted she was a member of the gang and on her association with other known gang members. Officer Hargrove testified as to Perez that he had observed multiple tattoos related to the West Side Wilmas gang on Perez's arms, torso, and shoulders.

Presented with a hypothetical based on the shooting in this case, Officer Hargrove testified the crime was committed in

7

association with and for the benefit of the West Side Wilmas gang with the specific intent to promote or further assist in criminal conduct by members of that gang. Officer Hargrove explained that where multiple gang members are present in rival gang territory and are approached by someone wearing the colors associated with the rival gang, for one of the members to challenge the rival by saying "where you from" and then to commit violence against him or her was conduct that would benefit the gang because violence against rivals in rival territory increases the status of the gang, reduces the likelihood the gang's own members will be preyed upon, intimidates members of the community, and reduces the likelihood that witnesses will cooperate with law enforcement, making it easier for the gang to engage in other criminal conduct. The presence of multiple West Side Wilmas gang members at the time the challenge was made, who then drove away together, showed the gang members were acting in association with one another during the commission of a crime. Through this conduct, the shooter was also attempting to promote the West Side Wilmas gang and his status within the gang subculture.

Presented with a hypothetical based on Perez's text messages to Tanya after the shooting, Officer Hargrove testified this conduct also was committed for the benefit of the West Side Wilmas gang with the specific intent to promote or assist in criminal conduct by gang members. Sending text messages specifically directed at stopping a witness from cooperating with law enforcement reduces the likelihood gang perpetrators will be apprehended for crimes, increases the number of gang members on the street involved in criminal activity, and benefits the gang and the individual urging noncooperation by increasing the gang member's status within the gang.

During cross-examination, Officer Hargrove admitted that Aleman was also a member of the West Side Wilmas with the moniker Knickknack, not a rival gang member. But Officer Hargrove opined it would not be unusual for a West Side Wilmas gang member to assume that a person approaching him wearing a red beanie was a member of a rival gang. Officer Hargrove also admitted that the desire to protect one's mother and sister from being witnesses to a gang shooting, which might place them in danger, could "potentially be an additional motivation" for sending text messages urging a witness not to say anything. However, on redirect examination, Officer Hargrove testified, "Just the fact that somebody is your sibling, you may have the additional motivation of attempting to persuade them not to cooperate because you are afraid for their safety or repercussions they may suffer from your own gang doesn't mean it's a mutually exclusive motivation. You could be motivated both by concerns for your siblings and concerns for your gang."

Officer Hargrove testified regarding two predicate offenses committed by West Side Wilmas gang members.[5] Edward Guerrero was convicted of attempted carjacking in April 2015. Officer Hargrove had arrested Guerrero on multiple occasions, and he knew Guerrero was a member of West Side Wilmas because Guerrero personally admitted to being a member of the gang with the moniker Toro. In addition, Officer Hargrove

---

[5] The prosecution initially submitted the criminal docket for a third predicate offense: the 2016 conviction of Jimmy Amaya for unlawful possession of ammunition. However, the prosecution elected not to rely on this offense after defense counsel objected on hearsay grounds to Officer Hargrove's testimony that Amaya was a member of the West Side Wilmas gang.

observed numerous West Side Wilmas tattoos on Guerrero. Sebastian Guimary was convicted of assault with a semiautomatic firearm in June 2018. Officer Hargrove had arrested Guimary on multiple occasions, and Guimary admitted to Officer Hargrove that he was a West Side Wilmas gang member with the moniker Boo Boo. Officer Hargrove also observed that Guimary had West Side Wilmas gang tattoos.[6]

B.      *The Verdicts and Sentencing*

The jury found Bueno guilty of second degree murder (§ 187, subd. (a); count 5) and possession of a firearm by a felon (§ 29800, subd. (a)(1); count 3).[7] As to the murder, the jury found true the firearm enhancement allegations (§ 12022.53, subds. (b), (c), (d)). The jury also found true as to both counts the gang enhancement allegations (§ 186.22, subd. (b)(1)(A), (C)). In a bifurcated proceeding Bueno admitted he suffered a prior felony conviction in 2013 for violation of section 245, subdivision (a)(2).

The trial court sentenced Bueno to an aggregate term of 55 years to life plus nine years in state prison. On count 5 for murder the court imposed a sentence of 15 years to life, doubled under the three strikes law, plus 25 years to life on the firearm enhancement (§ 12022.53, subd. (d)), for a total of 55 years to life. The court stayed the sentence on the gang enhancements.[8] As to

---

[6]      Bueno and Perez did not testify or call any witnesses.

[7]      The parties stipulated that Bueno was prohibited from possessing a firearm within the meaning of section 29820.

[8]      The trial court also struck the allegations Bueno's prior strike conviction was a serious felony conviction within the meaning of section 667, subdivision (a)(1), and that he had served

count 3, the court imposed the upper term of three years, doubled under the three strikes law, plus three years for the gang enhancement (§ 186.22, subd. (b)(1)(A)), for a total of nine years.[9]

The jury found Perez guilty of accessory after the fact (§ 32; count 2) and found true the gang enhancement allegation (§ 186.22, subd. (b)(1)(A)).[10]  In a bifurcated proceeding Perez admitted he suffered a prior juvenile adjudication in 2014 for a felony violation of section 245, subdivision (a)(1).  The court sentenced Perez to nine years in state prison (the upper term of three years doubled under the three strikes law, plus three years for the gang enhancement).

Bueno and Perez timely appealed.

## DISCUSSION

A.    *Substantial Evidence Supports the Gang Enhancements*
        1.    *Applicable law and standard of review*
To prove a gang enhancement, the prosecution must prove "both of the two prongs of the gang enhancement under section 186.22, subdivision (b)(1).  'First, the prosecution is required to

---

a prior prison term within the meaning of section 667.5, subdivision (b).  We assume the trial court struck or stayed the remaining firearm enhancement allegations.

[9]    Bueno requests we correct the abstract of judgment to reflect he was entitled to an additional day of pretrial custody credit.  However, on October 6, 2020 the trial court amended the abstract of judgment to correct Bueno's custody credit.  Accordingly, Bueno's request is moot.

[10]    The jury found Perez not guilty of unlawful firearm activity.  (§ 29820, subd. (b).)

11

prove that the underlying felonies were "committed for the benefit of, at the direction of, or in association with any criminal street gang.""" (*People v. Perez* (2017) 18 Cal.App.5th 598, 606-607 (*Perez*); accord, *People v. Weddington* (2016) 246 Cal.App.4th 468, 484 ["The first prong requires that the prosecution prove the underlying felony was 'gang related.'"].) "'Second, there must be evidence that the crimes were committed "with the specific intent to promote, further, or assist in any criminal conduct by gang members.""" (*Perez*, at p. 607, quoting *People v. Rios* (2013) 222 Cal.App.4th 542, 561.)

"Because the first prong is worded in the disjunctive, a gang enhancement may be imposed without evidence of any benefit to the gang so long as the crime was committed in association with or at the direction of another gang member." (*People v. Weddington, supra*, 246 Cal.App.4th at p. 484; accord, *People v. Leon* (2008) 161 Cal.App.4th 149, 162.) "The first prong therefore may be established with substantial evidence that two or more gang members committed the crime together, unless there is evidence that they were 'on a frolic and detour unrelated to the gang.'" (*Weddington*, at p. 484; accord, *People v. Garcia* (2016) 244 Cal.App.4th 1349, 1367 [gang members committed armed robberies in association with the gang because crimes were committed in concert with fellow gang members]; see *People v. Albillar* (2010) 51 Cal.4th 47, 60 (*Albillar*) [three gang members who raped victim committed crimes in association with gang because they "relied on their common gang membership and the apparatus of the gang in committing the sex offenses"].)

Alternatively, expert opinions based on hypothetical questions "'that particular criminal conduct benefited a gang' [are] not only permissible but can be sufficient to support the Penal Code section 186.22, subdivision (b)(1), gang

enhancement." (*People v. Vang* (2011) 52 Cal.4th 1038, 1048; accord, *Albillar, supra*, 51 Cal.4th at p. 63 ["Expert opinion that particular criminal conduct benefited a gang by enhancing its reputation for viciousness can be sufficient to raise the inference that the conduct was 'committed for the benefit of . . . a[] criminal street gang' within the meaning of section 186.22(b)(1)."]; *Perez, supra*, 18 Cal.App.5th at p. 608.)  However, expert gang testimony cannot be "purely conclusory and factually unsupported." (*People v. Ramirez* (2016) 244 Cal.App.4th 800, 819-820; accord, *People v. Richardson* (2008) 43 Cal.4th 959, 1008 [an "expert's opinion may not be based 'on assumptions of fact without evidentiary support'"].)

As to the second prong that the defendant committed the underlying offenses with the specific intent to further, promote, or assist in the criminal activity of gang members, ""'[i]ntent is rarely susceptible of direct proof and usually must be inferred from the facts and circumstances surrounding the offense.'"" (*People v. Franklin* (2016) 248 Cal.App.4th 938, 949.)  "For this reason, 'we routinely draw inferences about intent from the predictable results of action.'" (*People v. Miranda* (2011) 192 Cal.App.4th 398, 411 (*Miranda*).)  "While a gang expert is prohibited from opining on a defendant's specific intent when committing a crime, the prosecution can ask hypothetical questions based on the evidence presented to the jury . . . whether the hypothetical perpetrator harbored the requisite specific intent." (*Perez, supra*, 18 Cal.App.5th at p. 607.)  Specific intent may also be inferred where a gang member commits a crime to intimidate "rival gang members and neighborhood residents, thus facilitating future crimes committed by himself and his fellow gang members." (*People v. Vazquez* (2009) 178 Cal.App.4th 347, 353.)

"In deciding whether substantial evidence supports both prongs, we apply the familiar standard of review for challenges to the sufficiency of the evidence." (*Perez, supra*, 18 Cal.App.5th 598, 607; accord, *In re Daniel C.* (2011) 195 Cal.App.4th 1350, 1359.) "[W]e review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] We presume every fact in support of the judgment the trier of fact could have reasonably deduced from the evidence. [Citation.] If the circumstances reasonably justify the trier of fact's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding." (*Albillar, supra*, 51 Cal.4th at pp. 59-60; accord, *Perez*, at p. 607.)

> 2. *There was substantial evidence Bueno's shooting of Aleman and possession of a firearm were committed to benefit and in association with the West Side Wilmas gang with the specific intent to further, promote, or assist criminal activity of gang members*

Bueno contends there was insufficient evidence to support the gang enhancements because "there was no evidence nor argument that [he] was doing anything besides enjoying the evening with Perez" and "[t]here was no expression of gang signs, gang epithets, gang challenges or anything based on gangs." Substantial evidence supports the gang enhancement allegations.

14

As Tanya testified, Bueno, Perez, and Venegas—all members of the West Side Wilmas gang[11]—were gathered outside when Aleman arrived. The surveillance video showed that right after Aleman was dropped off, Bueno walked into the middle of the street. Bueno asked Aleman where he was from, and when Aleman did not respond, Bueno shot him multiple times. Immediately after the shooting, Bueno, Perez, and Venegas got into Venegas's car and left. The nine shell casings recovered at the scene matched the gun found in Venegas's car. Officer Maynard's body camera footage showed Aleman was wearing a red beanie, the color of the rival East Side Wilmas gang. Further, the shooting was in rival East Side Wilmas gang territory.

Contrary to Bueno's contention there was no evidence of a gang motive, Officer Hargrove testified that a gang member asking "where you from?" is making a gang challenge. Officer Hargrove opined that a gang member who makes this challenge in the presence of fellow gang members to a person wearing rival gang colors, then commits violence on the person if he or she does not respond, is acting in association with and for the benefit of a criminal street gang. The conduct is intended to further the interests of gang members by increasing the gang's status, discouraging rivals from preying on members, intimidating the community, and reducing witness cooperation with the police, all of which would promote the gang's criminal activities. Tanya's

---

[11]     Tanya testified Perez and Bueno were both members of the West Side Wilmas gang. Officer Hargrove testified Bueno and Venegas were members of the gang and described Perez's gang tattoos, but he did not specifically opine that Perez was a member of the gang.

testimony, the video evidence, and the expert testimony therefore amply support the first prong of the gang enhancement because the murder and possession of the firearm used in the shooting were committed in association with the West Side Wilmas gang and for the benefit of the gang.

As to the second prong, Bueno argues there was not substantial evidence of his intent to promote, further, or assist criminal conduct by the gang because he was merely socializing with Perez and Venegas, and he shot Aleman based on his "sensing an impending confrontation" due to his mistaken belief that Aleman was a rival gang member. The jury was instructed on self-defense (CALCRIM NO. 505) and imperfect self-defense (CALCRIM No. 571), but it rejected those theories in convicting Bueno of second degree murder. Bueno's argument that a mistaken shooting cannot benefit the gang by killing a fellow gang member lacks merit. The relevant question for the second prong is whether Bueno specifically intended to promote the criminal activity of gang members. Bueno may have been mistaken, but the facts of the shooting support the jury's finding Bueno challenged and killed Aleman with the specific intent to kill a rival gang member and promote the criminal activity of West Side Wilmas gang members.

> 3. *There was substantial evidence Perez acted for the benefit of and in association with the gang and specifically intended to further, promote, or assist in criminal activity by gang members*

Perez contends there was not substantial evidence to prove the gang enhancement because the prosecution's case relied solely on Officer Hargrove's speculative opinion that Perez's text messages to Tanya were intended to keep a member of the West

16

Side Wilmas gang out of custody. There was substantial evidence.

Tanya's testimony and the surveillance footage established that immediately after Bueno shot Aleman, Perez got into Venegas's car with Venegas and Bueno, and they "took off," leaving Aleman lying in the street. Four minutes later, Perez messaged Tanya from Venegas's car, "[T]ell mom not to say shit." After the police officers arrived at the scene, Tanya alerted Perez that the police were "looking for you guys," to which Perez again told Tanya not to say anything. When Tanya responded she saw everything, Perez instructed her to say she only heard the gunshots and again cautioned, "You better [not] say shit." This evidence was sufficient for the jury to find that Perez acted with the intent to help fellow gang member Bueno evade arrest. Although the jury could have found Perez was only trying to protect Tanya and his mother from reprisal from the gang if his family members cooperated with the police, as argued by defense counsel, "reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding." (*Albillar, supra*, 51 Cal.4th at p. 60.)

Further, in finding Perez guilty of being an accessory after the fact, the jury necessarily found that he "conceal[ed] or aid[ed] a principal in [a] felony, with the intent that said principal may avoid or escape from arrest, trial, conviction or punishment, having knowledge that said principal has committed such felony."[12] (§ 32.) As Officer Hargrove opined based on his

---

[12] The jury was instructed with CALCRIM No. 440 in part as follows: "To prove that the defendant is guilty of this crime, the People must prove that: [¶] 1. Another person, whom I call the

17

experience with the West Side Wilmas gang, sending a message intended to prevent witnesses from cooperating with the police in investigating a shooting benefits the gang by reducing the likelihood gang perpetrators are apprehended and increasing the number of gang members engaged in criminal activity on the street.

The cases cited by Perez are distinguishable. In *People v. Ochoa* (2009) 179 Cal.App.4th 650 (*Ochoa*), the Court of Appeal reversed the gang enhancements on the defendant's convictions for carjacking and attempted robbery where the defendant acted alone and gave no indication he was a member of a gang, and the expert cited no evidence to support his opinion a carjacking could benefit the gang, for example that the defendant used or intended to use the stolen car for a gang purpose. (*Ochoa, supra*, at pp. 653, 662-664; see *Miranda, supra*, 192 Cal.App.4th at p. 413 [distinguishing *Ochoa* where there was evidence the defendant was joined by fellow gang members in robbing and shooting a man sitting in his car, the crime was committed in the gang's territory, and the gang's name was called out].)

In *People v. Ramon* (2009) 175 Cal.App.4th 843, 848 the Court of Appeal reversed the gang enhancements on a defendant's conviction for receiving a stolen vehicle and possession of a firearm by a felon where the deputy sheriff opined

---

perpetrator, committed a felony; [¶] 2. The defendant knew that the perpetrator had committed a felony or that the perpetrator had been charged with or convicted of a felony; [¶] 3. After the felony had been committed, the defendant either harbored, concealed, or aided the perpetrator; [¶] and [¶] 4. When the defendant acted, he intended that the perpetrator avoid or escape arrest, trial, conviction, or punishment."

only that the fact two gang members were driving a stolen vehicle in gang territory with an unregistered firearm benefitted the gang because the gang members "could commit" crimes while they were in possession of the vehicle and firearm. The court concluded, "While it is possible the two were acting for the benefit of the gang, a mere possibility is nothing more than speculation," and "[s]peculation is not substantial evidence." (*Id*. at p. 851; see *People v. Hunt* (2011) 196 Cal.App.4th 811, 822 [distinguishing *Ramon* on the ground that there "the expert had not identified the crime the defendant and his fellow gang member committed as one of the activities of the gang"]; *Miranda, supra*, 192 Cal.App.4th at p. 413 [same].) Here, unlike in *Ochoa* and *Ramon,* Perez's underlying offense was not one with the "mere possibility" of having been carried out to further gang activity, but rather, the jury found that by texting Tanya, Perez specifically intended to help Bueno evade arrest.[13]

---

[13] *In re Daniel C., supra*, 195 Cal.App.4th 1350, also relied on by Perez, is distinguishable. There, a minor affiliated with a gang entered a supermarket with two friends, one of whom was a gang member, attempted to steal a liquor bottle, struck the store manager with a bottle that broke, and fled with his friends. (*Id*. at p. 1353.) The Court of Appeal concluded there was not substantial evidence to support the intent prong for the gang enhancement, noting the minor and his friends did not identify themselves as gang members, the victim did not perceive the friends to be gang members, there was no evidence the friends entered the store planning to commit a violent crime, and the minor's assault was "simply a spur-of-the-moment reaction" to the manager's attempt to stop the theft. (*Id*. at pp. 1363-1364.)

19

4. *The gang expert's testimony as to the gang's primary activities was sufficient*

Perez and Bueno contend substantial evidence does not support the jury's true finding on the gang enhancement because Officer Hargrove's testimony did not provide sufficient proof of the primary activities of the West Side Wilmas gang. The testimony was sufficient.

"[Section 186.22,] subdivision (b)(1) enhances the sentence for any 'felony committed for the benefit of . . . any criminal street gang.' The definition of a criminal street gang in section 186.22, subdivision (f) requires that the gang have 'as one of its primary activities' the commission of one or more of the criminal acts enumerated in subdivision (e). Evidence of both past offenses and the currently charged offenses may be considered in determining whether one of the primary activities of the gang is committing one or more of the offenses enumerated in the statute." (*People v. Nguyen* (2015) 61 Cal.4th 1015, 1068; accord, *People v. Sengpadychith* (2001) 26 Cal.4th 316, 323 ["The phrase 'primary activities,' as used in the gang statute, implies that the commission of one or more of the statutorily enumerated crimes is one of the group's 'chief' or 'principal' occupations."].)

"'Sufficient proof of the gang's primary activities might consist of evidence that the group's members *consistently and repeatedly* have committed criminal activity listed in the gang statute.'" (*People v. Nguyen, supra*, 61 Cal.4th at p. 1068; accord, *People v. Sengpadychith, supra*, 26 Cal.4th at p. 324.) Expert testimony as to the gang's primary activities may be based on a gang expert's conversations with gang members and the expert's personal investigation of crimes committed by gang members. (*Sengpadychith*, at p. 324; see *People v. Prunty* (2015) 62 Cal.4th 59, 82 [gang expert's testimony about gang's "various criminal

20

practices, including homicide, assault, and firearms offenses" was "likely sufficient" to establish primary activities element]; *Nguyen*, at p. 1068 [expert's testimony listing multiple crimes enumerated in statute as primary activities of the gang was sufficient]; *People v. Vy* (2004) 122 Cal.App.4th 1209, 1226 [testimony by a gang expert as to three violent felonies committed by small gang over three-month period was sufficient to satisfy primary activities element].) We review the jury's implied finding the primary activities element of the gang enhancement was proven for substantial evidence. (*People v. Garcia, supra*, 244 Cal.App.4th at p. 1368.)

Officer Hargrove testified the primary activities of the West Side Wilmas gang included robberies, assaults with a deadly weapon, shootings, witness intimidation, possession of ammunition, carjacking, attempted carjacking, murder, and attempted murder. These activities are among the enumerated offenses under section 186.22, subdivision (e)(1) (assault with a deadly weapon), (2) (robbery), (3) (homicide), (5) (shooting at inhabited dwelling or occupied vehicle), (6) (shooting from vehicle), (8) (witness intimidation), and (21) (carjacking). Officer Hargrove also testified regarding two offenses committed by members of the West Side Wilmas gang: Guerrero's conviction for attempted carjacking in April 2015 and Guimary's conviction of assault with a semiautomatic firearm in June 2018.[14]

---

[14] Bueno relies on *People v. Sanchez* (2016) 63 Cal.4th 665, 670 to argue Officer Hargove's testimony that Guerrero and Guimary were gang members was improperly based on case-specific hearsay. But *Sanchez* is inapposite because Guerrero's and Guimary's statements that they were gang members were

Further, Officer Hargrove provided a foundation for his testimony about the West Side Wilmas gang's primary activities, explaining his testimony was based on his assignment in the Harbor division gang unit, where he was tasked with monitoring the West Side Wilmas gang since 2011, and daily contact with gang members.  He also encountered members of the gang "on numerous occasions" during his investigations of gang crimes. Moreover, Officer Hargrove had arrested Guerrero and Guimary multiple times prior to the murder of Aleman.[15]

---

admissible under the hearsay exception for declarations against interest.  (Evid. Code, § 1230.)

[15] The cases cited by Perez in which a gang expert's primary activities testimony was deemed insufficient are distinguishable. In *In re Alexander L.* (2007) 149 Cal.App.4th 605, 611, the gang expert testified only that the gang "committed quite a few assaults with a deadly weapon," and had "been involved in" murders, auto thefts, vehicle burglaries, felony graffiti, and narcotic violations.  The Court of Appeal concluded the testimony lacked an adequate foundation because the expert provided no specifics on the crimes and failed to testify the crimes constituted the gang's primary activities. (*Id.* at p. 612.)  In *People v. Perez* (2004) 118 Cal.App.4th 151, 160, the Court of Appeal held a gang expert's testimony that the defendant's gang was responsible for shooting "a few individuals over a period of less than a week," plus one beating of an Asian child six years earlier, was insufficient to show gang members "*consistently and repeatedly*" committed criminal activity enumerated in section 186.22, subdivision (e)(1).

B.  *The Trial Court Did Not Abuse Its Discretion in Admitting the Video from Officer Maynard's Body Camera*

Bueno and Perez contend the trial court abused its discretion under Evidence Code sections 350 and 352[16] and violated their due process rights in admitting video footage from Officer Maynard's body camera showing Aleman after the shooting. They argue the footage, which shows Officer Maynard performing chest compressions on Aleman, checking his pulse, and examining his head for injuries, was unnecessary to prove the People's case and was cumulative. Further, they contend the video was prejudicial because it contains a "gruesome image of Mr. Aleman being brought back to life by the officers" and "show[s] the victim bloody from his gunshot wounds and gasping for breath with the police officers frantically trying to save him." (Perez AOB 39)~ The trial court did not abuse of discretion.

Courts are """often asked to rule on the propriety of the admission of allegedly gruesome photographs. [Citations.] At base, the applicable rule is simply one of relevance, and the trial court has broad discretion in determining such relevance. [Citation.] "'[M]urder is seldom pretty, and pictures, testimony and physical evidence in such a case are always unpleasant'" [citation] . . . . [W]e rely on our trial courts to ensure that relevant, otherwise admissible evidence is not more prejudicial

---

[16]  Evidence Code section 350 provides, "No evidence is admissible except relevant evidence." Section 352 states, "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury."

than probative (Evid. Code, § 352). A trial court's decision to admit photographs . . . will be upheld on appeal unless the prejudicial effect . . . clearly outweighs their probative value. [Citation.] Finally, prosecutors, it must be remembered, are not obliged to prove their case with evidence solely from live witnesses; the jury is entitled to see details of the victims' bodies to determine if the evidence supports the prosecution's theory of the case."'" (*People v. Powell* (2018) 6 Cal.5th 136, 163-164; accord, *People v. Suarez* (2020) 10 Cal.5th 116, 173.) The appellate courts "afford trial courts wide discretion in assessing whether in a given case a particular piece of evidence is relevant and whether it is more prejudicial than probative." (*People v. Duff* (2014) 58 Cal.4th 527, 558.)

Although the jury heard Tanya's description of the shooting, viewed surveillance video, and heard testimony from Officer Maynard and Dr. Panchal about Aleman's injuries and the cause of death, the body camera video was relevant to show that Bueno shot Aleman in the back of the head or neck and left him bleeding on the street to prove Bueno's intent to kill (and the lack of self-defense), as well as the gang-related nature of the offense. (See *People v. Merriman* (2014) 60 Cal.4th 1, 80 ["the court is not required to exclude photographic or other documentary evidence simply because the images they depict could have been described by a witness]; *People v. Sattiewhite* (2014) 59 Cal.4th 446, 471 ["crime scene photographs were relevant to establish the killer's mental state" and were not cumulative]; *People v. Booker* (2011) 51 Cal.4th 141, 170-171 [trial court did not abuse its discretion in admitting "particularly gruesome photographs" where they "tended to prove an intent to kill"].) The video also showed that Aleman was wearing a red beanie just after he was shot. Although the crime scene

24

photographs showed a red beanie among the items later found on the street, the video of Aleman wearing the red beanie at the time of the shooting was stronger evidence to support a finding Bueno intended to kill a rival gang member.

We agree the video is unpleasant to watch (showing a pool of blood under Aleman's head and depicting efforts to keep him alive), but it was not gruesome, and the officers succeeded at sustaining Aleman's life as shown in the video. As the Supreme Court held in *People v. Watson* (2008) 43 Cal.4th 652, 684 in concluding the trial court did not abuse its discretion in admitting crime scene photographs of the victim's body and blood splatters on the sidewalk, "Although unpleasant, they depict the nature of the crime without unnecessarily playing upon the jurors' emotions." Because there was no abuse of discretion, admission of the video footage did not violate Bueno's and Perez's due process rights.

C.     *The Trial Court's Enhancement of Perez's Sentence on the Basis of His Prior Juvenile Adjudication Did Not Violate His Constitutional Right to a Jury Trial*

Perez contends that because he did not have a right to a jury trial in his 2014 juvenile adjudication for assault, the trial court's reliance on the adjudication to enhance his sentence under the three strikes law violated his Sixth Amendment right to a jury trial. Perez acknowledges the Supreme Court has held that use of prior juvenile adjudications to enhance a defendant's sentence does not violate the defendant's Sixth Amendment right to a jury trial. (See *People v. Nguyen* (2009) 46 Cal.4th 1007, 1028 (*Nguyen*).) But Perez contends recent decisions by the United States and California Supreme Courts have "eviscerated" the holding of *Nguyen*. They have not.

Relying on *Descamps v. United States* (2013) 570 U.S. 254 (*Descamps*), *Mathis v. United States* (2016) 579 U.S. ___ [136 S.Ct. 2243] (*Mathis*), and *People v. Gallardo* (2017) 4 Cal.5th 120 (*Gallardo*), Perez argues *Nguyen* is no longer controlling precedent.  However, these cases did not involve the validity of using prior juvenile adjudications rendered without the right to a jury trial to enhance a sentence subsequently imposed on an adult convicted of a felony.  Instead, those cases involved limits on judicial factfinding with respect to whether a prior conviction was for conduct that qualifies as a sentence enhancement.

As the California Supreme Court explained in *Nguyen*, "[a] series of United States Supreme Court decisions, beginning with [*Apprendi v. New Jersey* (2000) 530 U.S. 466], establishes an adult criminal defendant's general right . . . to a jury finding beyond reasonable doubt of any fact used to increase the sentence for a felony conviction beyond the maximum term permitted by conviction of the charged offense alone."  (*Nguyen, supra*, 46 Cal.4th at p. 1010.)  Notably excepted from *Apprendi*'s general rule is "the fact of a prior conviction," which may properly be determined by the sentencing court.  (*Apprendi, supra*, 530 U.S. at p. 490.)  In *Nguyen*, the California Supreme Court held that "*Apprendi* does not bar the use of a constitutionally valid, fair, and reliable prior adjudication of criminal conduct to enhance a subsequent adult sentence simply because the prior proceeding did not include the right to a jury trial."  (*Nguyen*, at p. 1025.)

Subsequently, the United States Supreme Court decided *Descamps* and *Mathis*, both of which interpreted the federal Armed Career Criminal Act (ACCA; 18 U.S.C. § 924(e)) in light of *Apprendi*'s Sixth Amendment limits on judicial factfinding.  Those cases involved the "categorical" and "modified categorical" approaches to a sentencing court's determination of whether a

prior conviction qualifies as a predicate offense to enhance a subsequent sentence under the ACCA. (*Descamps, supra*, 570 U.S. at p. 257; *Mathis, supra*, 136 S.Ct. at p. 2248.) The United States Supreme Court concluded in each case that the sentencing courts were generally barred from looking beyond the statutory elements of the prior offenses to determine whether the defendant's conduct qualified for imposition of a sentence enhancement under the ACCA. (See *Descamps*, at pp. 259, 268-269 [sentencing court impermissibly relied on record of plea colloquy to find defendant's prior conviction for burglary involved unlawful entry]; *Mathis*, at p. 2250 [sentencing court impermissibly relied on records of prior conviction to determine that defendant had burglarized structures, rather than vehicles].)

In *Gallardo*, the California Supreme Court reevaluated its prior precedent in *People v. McGee* (2006) 38 Cal.4th 682 in light of *Descamps* and *Mathis*. The Court held: "*McGee* is no longer tenable insofar as it authorizes trial courts to make findings about the conduct that 'realistically' gave rise to a defendant's prior conviction. The trial court's role is limited to determining the facts that were necessarily found in the course of entering the [prior] conviction." (*Gallardo, supra*, 4 Cal.5th at p. 134.) The Supreme Court concluded the trial court erred in relying on the preliminary hearing transcript to determine "the nature of [the] prior conviction[]," which was "to be made by the court, rather than a jury, based on the record of conviction." (*Id*. at pp. 136-138.)

Although *Gallardo* limited the scope of permissible factfinding by the sentencing court in determining whether the defendant suffered a prior conviction, it did not disturb *Nguyen*'s holding that a sentencing court may validly impose a sentence enhancement based on the fact of a prior juvenile adjudication,

despite the lack of right to a jury trial in that proceeding. *Nguyen* remains controlling precedent binding on this court. (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455 ["Courts exercising inferior jurisdiction must accept the law declared by courts of superior jurisdiction. It is not their function to attempt to overrule decisions of a higher court."]; *People v. Martin* (2018) 26 Cal.App.5th 825, 832-833 [same].) Accordingly, the trial court's reliance on Perez's 2014 juvenile adjudication of assault for the purposes of the three strikes law did not violate Perez's constitutional right to a jury trial.[17]

## DISPOSITION

The judgments are affirmed.


FEUER, J.

We concur:


PERLUSS, P. J.          SEGAL, J.

---

[17] The People contend Perez forfeited his claim because defense counsel did not object to use of the prior juvenile adjudication at sentencing. Perez responds that an objection would have been futile because *Nguyen* was controlling law at the time of the sentencing. Because we would need to reach whether *Nguyen* is controlling to determine whether an objection would have been futile, we address the merits of Perez's claim.

28