Filed 9/30/24  In re Steven L. CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| In re STEVEN L., a Person Coming Under the Juvenile Court Law. | |
| | D083082 |
| THE PEOPLE, | |
| Plaintiff and Respondent, | (Super. Ct. No. J245145) |
| v. | |
| STEVEN L., | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of San Diego County, Tilisha Martin, Judge.  Affirmed.

Elisa A. Brandes, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Charles C. Ragland, Assistant Attorney General, Steve Oetting and Joshua Trinh, Deputy Attorneys General, for Plaintiff and Respondent.

Minor Steven L. pled guilty to assault by means of force likely to cause great bodily injury (Pen. Code, § 245, subd. (a)(4))[1] after an incident where he and three others punched, kicked, and threw a glass bottle at another minor. The People further alleged that Steven committed the assault for the benefit of a gang within the meaning of section 186.22, subdivision (b)(1). Following a bench trial on the gang enhancement allegation, the juvenile court found the allegation to be true.

Steven appeals only the gang enhancement, contending that there was insufficient evidence that one of the alleged predicate offenses commonly benefitted a criminal street gang as required under the recently enacted changes to section 186.22. We disagree and affirm the judgment.

FACTUAL AND PROCEDURAL BACKGROUND

A. *The Prosecution's Case in Chief*

In May 2023, C.P. and his friend had just exited a trolley station in San Ysidro when four boys approached them and asked where they were from. C.P. did not initially respond, but when the group asked whether he and his friend were "from a neighborhood," C.P. responded, "no, no, sir." The four boys then jumped C.P., punching and kicking him all over his body. C.P. did not remember what happened after that because he was on the ground, but he agreed that the video surveillance footage that captured the incident accurately showed what happened to him that day. C.P. told a police officer he spoke with the day after the incident that he heard one of his attackers say "this is Nestor" as they walked away.

The investigating detective identified Steven as one of the attackers. Steven used a cell phone to record C.P. during the attack and sent it in a

---

[1] Undesignated statutory references are to the Penal Code.

2

group chat afterwards, bragging about the assault. The cell phone video recorded one of the attackers, seemingly Steven, saying, "fuck shit yard." Steven also threw a glass bottle at C.P. during the attack. C.P. interpreted "shit yard" as referring to the San Ysidro neighborhood where he was from and understood that phrase was meant to "disrespect" his neighborhood. San Diego Police Detective Michael Muniz also testified that the phrase " 'shit yard' " is "a term of disrespect to the San Ysidro criminal gang . . . that comes from a rival gang."

The San Ysidro gang is a traditional Hispanic gang that is a rival of the Nestor gang, another gang in San Diego. The Nestor gang's territory is the Nestor neighborhood. A gang member entering a rival gang's territory is disrespectful, and gang members are expected to defend their territory from disrespect. Nestor gang members sometimes wear particular colors, brands, and types of clothing, have specific tattoos, and use certain hand signals, all of which represent their affiliation with the gang. The detective opined that, since Nestor was formed in the 1980s, Nestor members have collectively engaged in a pattern of criminal activity, including violent crime, such as robbery, assault, and attempted murder.

After the incident, Steven was arrested at his home. Police officers found a firearm, narcotics, the sweatshirt Steven wore during the incident, clothing affiliated with Nestor, and journal sketches depicting Nestor graffiti and gang signs in the bedroom Steven shared with his brother. The investigation of Steven's social media also revealed several photographs of Steven and Nestor gang members throwing up hand signs. Detective Muniz opined that Steven was a Nestor gang member based on this evidence as well as his previous investigations of Nestor. He further opined that the other three attackers were also Nestor gang members and that the assault was

3

committed at the direction of, for the benefit of, or in association with the Nestor gang. Detective Muniz stated that the assault benefitted the gang because it allowed the younger members to gain acceptance by "putting in work," improved the gang's reputation, and disrespected their rival gang by going into their rivals' territory and confronting them to exert their dominance.

In closing, the prosecutor argued that Steven and his fellow perpetrators were all documented Nestor gang members who assaulted a "perceived Sidro rival in Sidro territory. . . . By beating on a perceived rival in the rival's own territory it exploits the rival's weakness and intimidates that rival and other rivals. And when a rival's weakness is exploited, the rival is susceptible to being absorbed to losing territory, to losing members, and to losing strength by having injured members. Those are just some of the tangible benefits that Nestor ga[in]s from that collective assault, Nestor being a neighboring rival to Sidro."

B. *Predicate Crimes*

For the gang enhancement, the People relied on evidence of two predicate crimes committed in November 2021 and December 2020.

In the November 2021 incident, five Nestor gang members confronted two non-gang members outside a house in Nestor territory. One Nestor gang member instigated a fight with the non-members outside the house, and when he began to lose the fight, the four other Nestor gang members attacked the victims with a tire iron and hammer. One of the Nestor gang members then pulled out a firearm and fired multiple shots at the victims. One of the gang members pled guilty to assault by means likely to produce great bodily injury and was sentenced to two years in prison.

Approximately 20 to 30 minutes before the fight, a video recording captured an incident where the gang member who initiated the fight approached one of the victims. The two men exchanged words, but it is unknown what specifically was said.

One of the investigating police officers opined that this crime was committed for the benefit of the Nestor gang because reputation and respect are most important when it comes to the gang, and the expectation is for members to respect their fellow gang members and come to their aid. In closing, the prosecutor stated that this predicate offense showed the gang members' loyalty to Nestor, arguing that when a Nestor member "was losing a fight to a non-gang member, [] what followed was four other Nestor members rushing to the aid of their member. In that moment there was an expectation almost compulsory to defend Nestor's territory."

In the December 2020 incident, four people entered a Circle K gas station wearing face masks and blue and black clothing and stole various nicotine products. One man brandished a hammer towards the cashier while

5

the others grabbed the nicotine products, including $400 worth of e-cigarettes and $40 worth of swishers. The group then retreated to a vehicle outside the gas station where a fifth suspect drove the group away.

The incident was captured on video surveillance. Based on the suspects' clothing, gang signs, tattoos, and social media, police investigators determined they were associated with the Nestor gang. Investigators also uncovered videos showing the members wearing the same clothing in the surveillance footage, flashing gang signs, and showing the stolen items. The driver pled guilty in the case and was sentenced to ten years in state prison.

A detective opined that the robbery benefited Nestor primarily due to financial gain. He testified that "[w]hether they intend to sell the items or pocket them and not have to spend money on them, it would immediately result in financial gain." He further opined that "when you have younger members of the gang trying to put in work to make a name for themselves, to earn respect of other gang members and to establish dominion amongst other gangs, all of those things together lead me to believe they did this in association with the Nestor gang and for the benefit of them." The detective also testified that the fact that the gang members later recorded videos of the stolen items while throwing up gang signs consistent with Nestor supported his belief that the robbery was committed for the benefit of the Nestor gang.

In closing, the prosecutor argued that the "most obvious benefit" was "the financial motive or financial gain," but the gang also benefited because "the collective use of the Nestor members committing these crimes enhances the loyalty among the members to one another. It cements memories within that gang that could be used to educate, to embolden, and to commit further crime."

6

C. *Juvenile Court Adjudication and Disposition*

At the conclusion of closing arguments, the juvenile court found that the prosecution proved beyond a reasonable doubt the truth of the section 186.22, subdivision (b)(1) gang allegation. The court made the following comments regarding the instant offense: "First, you can actually use the videotape of this attack as a training video as to what constitutes a gang challenge and subsequent beat down. In this case we have a classic verbal gang challenge. Four Nestor gang members then proceed, and proceed quickly, to engage in a group beat down of a perceived rival. In this case the beat down occurred in rival gang territory. The minor was an active participant in the beating." As to the 2021 predicate offense, the court found: "One does not have to use your imagination to see that the 11/14/21 incident was once again a gang beat down, except this time they used a gun, a tire iron, and a hammer." The court did not make any express finding as to a common benefit. Regarding the 2020 predicate offense, the court found: "Similarly, the December 15, 2020 second predicate offense was a videotaped robbery of the Circle K, gang members acting in association with one another for financial [gain] and certainly for reputational benefit for their gang."

The court adjudged Steven a ward of the court per Welfare and Institutions Code section 602, placed him in the custody of his mother, ordered probation and to comply with probation orders, and imposed a curfew, gang conditions, and a restitution fine of $100.

7

DISCUSSION

Steven appeals only the gang enhancement conviction under section 186.22, subdivision (b)(1), contending there was insufficient evidence that one of the alleged predicate crimes, the December 2020 robbery, commonly benefitted the gang in a way that was more than reputational.

*Standard of Review*

Our review of a claim of insufficiency of the evidence is limited.  We review the entire record in the light most favorable to the judgment to determine whether it contains substantial evidence—that is, evidence that is reasonable, credible, and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt.  (*People v. Albillar* (2010) 51 Cal.4th 47, 59–60 (*Albillar*).)  We presume every fact in support of the judgment that could have reasonably been deduced from the evidence. (*Id*. at p. 60.)  If the circumstances reasonably justify the court's findings, reversal of the judgment is not warranted simply because the circumstances might also reasonably be reconciled with a contrary finding.  (*Ibid*.)

*Analysis*

The Penal Code provides enhanced punishment for someone "convicted of a felony committed for the benefit of, at the direction of, or in association with a criminal street gang, with the specific intent to promote, further, or assist in criminal conduct by gang members[.]"  (§ 186.22, subd. (b)(1); *People v. Clark* (2024) 15 Cal.5th 743, 751–752 (*Clark*).)  The Legislature first enacted section 186.22 in 1988 as part of what is known as the STEP Act. (*Clark*, at p. 751.)  In 2021, the Legislature substantially amended the STEP Act by enacting Assembly Bill No. 333, which went into effect January 1, 2022 (2021–2022 Reg. Sess.) (Stats. 2021, ch. 699, § 1) (Assembly Bill 333). (*Clark*, at p. 752.)  The new legislation, which became effective on January 1,

8

2022, made several changes to the statutory definitions relating to gang enhancements in section 186.22.

As now more narrowly defined, a "criminal street gang" is an "ongoing, organized association or group of three or more persons" that: (1) has a common name or common identifying sign or symbol; (2) has, as one of its primary activities, the commission of the offenses listed in section 186.22, subdivision (e)(1); and (3) whose members collectively engage in or have engaged in a pattern of criminal gang activity. (§186.22, subd. (f).) To establish a pattern of criminal gang activity, the People have to prove at least two predicate offenses. (§ 186.22, subd. (e)(1).) With respect to the predicate offenses, the People must meet the following requirements: (1) the offenses must have commonly benefited a criminal street gang; (2) the last predicate offense must have occurred within three years of the date of the currently charged offense; (3) the predicate offenses must be committed on separate occasions or by two or more gang members, as opposed to persons; and (4) the charged offense cannot be used as a predicate offense. (*People v. Tran* (2022) 13 Cal.5th 1169, 1206; § 186.22, subd. (e)(1), (2).)

Assembly Bill 333 also "narrowed what it means for an offense to have commonly benefitted a street gang, requiring that any common benefit be more than reputational." (*Clark, supra*, 15 Cal.5th at p. 752 [cleaned up]; § 186.22, subd. (g).) Examples of such benefits "include, but are not limited to, financial gain or motivation, retaliation, targeting a perceived or actual gang rival, or intimidation or silencing of a potential current or previous witness or informant." (§ 186.22, subd. (g).)

At issue on appeal here is whether there was sufficient evidence of a common benefit that was more than reputational from the December 2020

predicate crime.[2]  The parties agree that the robbery was committed by Nestor gang members and that those individual members received a financial benefit.  Steven contends, however, that there was no evidence the Nestor gang as a whole received anything other than a possible reputational benefit from committing the Circle K robbery, and his gang enhancement conviction must therefore be reversed.  The People argue that because the detective opined that the gang benefited financially from the robbery and the gang members collectively gained the value of nicotine products as a result of their Nestor gang association, it was reasonable for the court to determine that the robbery provided a common financial benefit to the gang.

The People rely heavily on the Supreme Court's decision in *People v. Renteria* (2022) 13 Cal.5th 951 (*Renteria*).  There, the court noted that its prior decision in *Albillar* "established that in cases where multiple gang members were involved in the charged offense, the fact of their joint involvement in a crime often provides sufficient evidence of association and benefit, as well as circumstantial evidence of an intent to promote the criminal activity of other gang members, in connection with the very same criminal offense." (*Renteria*, at p. 963.)  But these two cases offer little assistance in construing the "common benefit" requirement of Assembly Bill 333.  *Albillar* predated the enactment of Assembly Bill 333 by over a decade, and *Renteria* explicitly declined to decide the effect of the new law and instead "focus[ed] on the law as it existed before the enactment of Assembly Bill 333." (*Renteria*, at p. 961 & fn. 6.)

---

[2]     We assume without deciding that the evidence was sufficient to demonstrate such a benefit for the current offense and the November 2021 predicate offense.  Steven does not contest this on appeal.

We find more instructive two recent Supreme Court cases finding prejudicial error arising from the absence of jury instructions on the new requirements for gang enhancements under Assembly Bill 333. In *People v. Cooper* (2023) 14 Cal.5th 735 (*Cooper*), the court observed that, "the grand total of evidence relied on by the Attorney General for proving that the alleged predicate offenses provided a common benefit that is more than reputational to the gang is that there was a robbery and a sale of narcotics by gang members and that a primary activity of the gang is to commit robberies and the sale of narcotics." (*Id.* at p. 746.) The record in that case, however, did "not disclose the circumstances surrounding the predicate offenses and the prosecution never introduced any evidence about how the gang commonly benefited from them. While robbery and the sale of narcotics typically provide a financial benefit to the *offender*, the record contains evidence that could rationally lead to a contrary finding regarding whether the fruits of the offenses were intended to or did benefit the *gang as a whole*," as opposed to for each offender's personal gain alone. (*Id.* at pp. 743–744.) The court thus rejected the argument "that crimes that have an inherent financial benefit and that are identified as the gang's primary activities qualify as a common benefit to the gang that is 'more than reputational' under Assembly Bill 333," finding that "the Attorney General's interpretation would render superfluous much of the new amendment that requires both that predicate offenses 'commonly benefited' the gang and that the common benefit is 'more than reputational.'" (*Ibid.*)

More recently, the Supreme Court reversed a gang enhancement allegation for instructional error because "other than general testimony concerning how gang members could benefit the gang through criminal acts, there was no other evidence 'about how the specific predicate offense actually

11

benefited the gang.' " (*People v. Lamb* (2024) 16 Cal.5th 400, 451 (*Lamb*)) [record of a predicate crime offender's convictions for financial crimes failed to "prove that *the gang* benefited financially or otherwise in a manner that was more than reputational"], citing *People v. E.H.* (2022) 75 Cal.App.5th 467, 473, 478–480 [concluding that although the predicate offenses included crimes that could theoretically provide a monetary benefit to the gang, the evidence did not show that these offenses *actually* benefited the gang] and *Cooper, supra*, 14 Cal.5th at pp. 743–744.) The court found that because there was no evidence as to how the predicate offenses, including certain financial crimes, "*actually* provided a common benefit that was more than reputational," the instructional error was prejudicial and the jury's true findings on the gang enhancements had to be reversed for retrial. (*Lamb*, at p. 451, italics added.) Although the "financial crimes could in theory have offered a common benefit that was more than reputational," the court concluded that "the record here does not establish that benefit." (*Id.* at pp. 453–454.)

We recognize that *Cooper* and *Lamb* involved instructional error rather than sufficiency of evidence, but we nevertheless find the Supreme Court's reasoning helpful. As we read those cases, it is not enough that a robbery or other financial crime committed by gang members could *theoretically* confer a common benefit on the gang that is more than reputational. Rather, there must be some evidentiary basis for the trier of fact to find that the gang *actually* received such a common benefit from the predicate crime. (See *Cooper, supra*, 14 Cal.5th at p. 743 ["the question about a common benefit asks about how the specific predicate offense actually benefited the gang"]; *Lamb, supra*, 16 Cal.5th at p. 453 ["there is a lack of evidence as to how the specific predicate offenses at issue actually commonly benefited the gang"].)

12

Thus, the question before us is whether there is evidence in the record from which a factfinder could reasonably infer that the Circle K robbery actually conferred a common benefit on the gang in a way that was more than reputational.

We find this to be a close question. At the outset, we reject the gang expert's theory that a common benefit may be established from the mere fact that the robbery was committed by several gang members acting together. Specifically, the gang expert testified: "Well, it is my opinion that these subjects are members of the Nestor gang, so the fact that they left the store with the items is immediate grounds for me to believe that them being a part of the gang benefited from those stolen items . . . . "[T]he fact that they worked together as four or five leads me to believe that they did do the act to benefit the gang, and it directly shows that *the second they walk out with the items*, in my opinion." (Italics added.)

This opinion testimony impermissibly conflates the collective engagement and common benefit requirements. (See *In re Daniel C.* (2011) 195 Cal.App.4th 1350, 1364 [opinion testimony may not "expand[] the gang enhancement statute to cover virtually *any* crime committed by someone while in the company of gang affiliates, no matter how minor the crime, and no matter how tenuous its connection with gang members or core gang activities"].) Though the facts necessary to prove the two requirements often overlap, the requirements are still "conceptually distinct." (*Clark, supra*, 15 Cal.5th at p. 763; see also *id.* at p. 759 ["What the [legislative] history does indicate, however, is that the collective engagement language in section 186.22(f) was intended to have independent significance, separate and apart from the requirements for proving predicate offenses in section 186.22(e), such as the requirement to prove a common benefit to the gang."].)

Not every crime committed by gang members results in a common benefit to the gang, much less one that is more than reputational. (See *Albillar, supra*, 51 Cal.4th at p. 60.) Robberies may often be committed for financial gain, but that general principle does not establish that a particular robbery committed by gang members financially benefited the gang as a whole. (See *Cooper, supra*, 14 Cal.5th at p. 743.) Under the gang expert's theory, any time two or more gang members collectively engage in theft, there is automatically a common benefit to the gang based on financial gain, regardless of whether there is any evidence the gang actually benefitted from the crime—financially or otherwise. "[S]uch an interpretation is inconsistent with the legislative history [of Assembly Bill 333] indicating the Legislature was concerned with 'lax' interpretations of the prior law that allowed for overly expansive application of gang enhancements (Stats. 2021, ch. 699, § 2) and therefore sought to amend the law by 'making the standards for applying a gang enhancement more rigorous.' " (*Cooper, supra*, 14 Cal.5th at pp. 744–745.)[3]

We nevertheless conclude there is additional evidence in this record that supports an inference of common benefit to the gang. Specifically, after

---

[3] The Supreme Court further explained the Legislature's concern underlying the recent changes to section 186.22 in *Clark*: "Although the STEP Act was originally enacted to target crimes committed by violent, organized criminal street gangs, and was only meant to apply in the most egregious cases where a pattern of criminal gang activity was clearly shown, the STEP Act has been continuously expanded through legislative amendments and court rulings. The result, the Legislature found, was that current gang enhancement statutes criminalize entire neighborhoods historically impacted by poverty, racial inequality, and mass incarceration as they punish people based on their cultural identity, who they know, and where they live." (*Clark, supra*, 15 Cal.5th at pp. 760–761 [cleaned up].)

14

the robbery, the robbers posted videos of themselves throwing Nestor gang signs along with their stolen loot on social media. Moreover, the quantity of nicotine products stolen in the robbery supports a reasonable inference that they were not just for personal use. The gang expert testified that these videos supported his opinion that the robbery was committed for the benefit of the Nestor gang. Although the reputational benefit to the gang from these boastful videos may no longer be considered, the trier of fact could nevertheless infer from the quantity of the stolen goods depicted in the videos and the gang signs used by the robbers that they committed the robbery for the gang and shared the proceeds with the gang in some form. The evidence is not overwhelming, but we conclude it at least supports a reasonable inference that the gang actually received a common benefit that was more than just reputational. As a reviewing court, we cannot second-guess the inference drawn by the trier of fact on this question. Accordingly, there is sufficient evidence in the record to support the juvenile court's true finding on the gang enhancement.

## DISPOSITION

The judgment is affirmed.

BUCHANAN, J.

WE CONCUR:

McCONNELL, P. J.

DATO, J.